**NEWELL, et v CLEVELAND CEMETERY ASSOCIATION, et**

Ohio Appeals, 8th Dist, Cuyahoga Co

No 15949. Decided Feb. 21, 1938

374

J. Stephens, Cleveland; C. C. Eshelman, Cleveland, for plaintiffs-appellants.

Friebolin & Byers, Cleveland, for defendants-appellees.

## OPINION

By LIEGHLEY, J.

Plaintiffs brought an action in the common pleas court for injunction, accounting, cancellation of contracts, quiet title and other equitable relief. Plaintiffs filed their action as lot owners in the cemetery in their own behalf and in behalf of all other lot owners therein. Answers were filed by certain defendants. After several hearings in that court, judgment for defendant was entered. Thereupon plaintiffs appealed to this court on questions of law and fact.

While pending here, a demurrer by the defendants hereinafter named was duly filed to the amended petition which was overruled. Thereupon a joint answer to the amended petition was filed by the defendants-appellees, The Cleveland Cemetery Association, The Rocky River Land Company, Charles E. Kyle, Eva E. Kyle, C. Lee Graber, Belle T. Graber, Charles C. Bow, George H. Thorne, Lillian Blanchat and Jennie Burkhardt, in which they admit the execution of the deed and the contracts referred to in the petition, and generally deny the other allegations therein.

Hereinafter The Cleveland Cemetery Association will be referred to as The Association, and The Rocky River Land Company as The Company.

It is the acts and activities of these defendants to which the proof was almost exclusively directed although there are other defendants named in the amended petition.

The relationship of the individual defendants named was emphasized at the hearing. It was undisputed that Charles E. Kyle and Eva E. Kyle are husband and wife; that C. Lee Graber and Belle T. Graber are husband and wife; that Lillian Blanchat is a niece of Charles C. Bow, and Jennie Burk-

hardt is a sister of George H. Thorne.

There is not much dispute about the controlling facts in this lawsuit. The dispute relates primarily to the factual and legal conclusions and inferences that may be deduced therefrom.

The Cleveland Cemetery Association was organized under the laws of the State of Ohio as a corporation not for profit in 1912, for the purpose of operating and conducting a cemetery. From that date until his death, one Ross Taylor was the manager of the corporate interests and affairs of the Association. It owned six acres of land which had been acquired out of the center of a parcel of land of about one hundred acres owned by one Henry W. Stecher with a right of way to Detroit Road. During this period to August, 1918, it is said that there were less than two hundred burials in this cemetery.

On August 26, 1918, Stecher and Ross Taylor entered into a contract by the terms of which Stecher agreed to sell to Ross Taylor the remaining ninety-three acres of his farm for the sum of $90,-000.00, upon specified terms of payment with provision for release of acreage upon the payment of specified sums.

Some time during the Fall of 1918, Taylor approached the defendant, Dr. C. Lee Graber, it is claimed for a loan, representing that the cemetery was in debt, and in order to continue to operate funds were imperatively necessary and Dr. Graber agreed to let him have some money. Shortly thereafter it is claimed that Dr. Graber, motivated by a public spirited desire for a beautiful cemetery for the benefit of Rocky River and Lakewood, interested himself to the extent that he approached various individuals and particularly the other three men named defendants herein who joined in agreeing to advance money to the Association for the purposes of rehabilitating this cemetery.

Whatever negotiations were had is not of material importance for these purposes except as the same were merged into written documents and expressed by definite action. It is sufficient to assume that the so-called tri-party contract under date of February 7, 1919, represents the culmination thereof as the initial step in their program.

Generally, by the terms of this contract, the party of the first part, Ross Taylor, agreed to assign the Stecher contract for ninety-three acres to a real estate corporation to be formed by the party of the first part and the party of the second part. The party of the second part, consisting of Dr. Graber and Messrs. Kyle, Bow and Thorne, agreed to advance Eight Thousand Dollars ($8,000.00) to the Cemetery Association to liquidate its debts. The party of the third part, the Cemetery Association, agreed to execute notes for the Eight Thousand Dollars ($8,000.00) and to pay a percentage of its gross receipts into a fund to pay said loan.

Said contract further recites that the party of the second part is desirous of acquiring an interest in said option or contract for the ninety-three acres.

It was provided that this land company should be incorporated for $16,-000.00, represented by 1600 shares of a par value of $10.00 each, and that this stock should be divided by issuing 400 shares to Taylor, and 300 shares each to Graber, Kyle, Bow and Thorne. The distribution of the income of the Association is set forth in this contract.

It is further mutually agreed between these three parties to this contract that the Association shall agree to purchase said ninety-three acres covered by the Stecher contract.

This tri-party contract of February 7, 1919, is signed as follows:

First Party—Ross Taylor, signs in his own behalf;

In behalf of Second Party, it bears the signatures of Bow, Thorne, Graber and Kyle in their own behalf as individuals;

In behalf of Third Party, the Association, it is signed by Thorne as President, and Kyle as Secretary.

It is stipulated that The Rocky River Land Company is a corporation for profit, duly organized under the laws

of the State of Ohio on the 8th day of February, 1919, and that there were issued 1600 shares of stock of the par value of $10.00 per share. That it was formed to buy and sell real estate and do all things incident and pertinent thereto. That the articles were later amended by increasing the capital stock. That this corporation was formed for twenty-five years under authority of §8648, GC.

By endorsement on the Stecher contract of August, 1918, Henry W. Stecher on the 10th day of February, 1919, in writing consented to 'he extension of the terms of the contract for a period of six months and consented to an assignment by Ross Tay:or of said land contract to the defendants, Graber, Kyle, Bow and Thorne or to the Cleveland Cemetery Association.

By endorsement in writing on said contract said Ross Taylor on the 10th day of February, 1919, assigned said contract to Graber, Kyle, Bow and Thorne.

By endorsement on said contract in writing on the 20th day of February, 1919, said Graber, Kyle, Bow and Thorne assigned said contract to the Company.

As part of the agreement of February 7, 1919, Taylor undertook to procure the resignation of the other trustees of the Association.

When the first meeting was held for the organization of the Company, Belle T. Graber, Charles C. Bow, C. E. Kyle, Eva Kyle and Lillian Blanchat were elected directors. Belle T. Graber was elected President; Charles C. Bow, Vice President; C. E. Kyle, Secretary, and Eva Kyle, Treasurer. Officers then elected continued to the present as such.

The original 1600 shares were issued, 400 shares to Taylor, 300 shares to Belle T. Graber, 300 shares to Jennie T. Burkhardt, 300 shares to Lillian Blanchat and 300 shares to Eva E. Kyle. A year or two later the capital stock of the Company was increased and shares of the same par value in an amount of ten or twelve thousand dollars were issued to some of these men defendants or their relatives that paid for same. Aft-

er Taylor died in April, 1919, his stock was eventually acquired by Dr. Graber, Thorne and Kyle.

About the middle of February, 1919, a meeting of the Board of Trustees of the Association was held at which the resignation of four of the original trustees was presented and in their stead, Dr. Graber, Kyle, Bow and Thorne were elected trustees with Taylor to constitute the full board. The vacancy created by the death of Taylor has never been filled.

On February 24, 1919, the Board of Trustees of the Association passed a resolution to enter into a contract to purchase for cemetery purposes from the Company the land covered by the Stecher contract which had been assigned to said Company on February 10, 1919, by Graber, Kyle, Bow and Thorne. This contract was consummated.

So that we are presented with the picture of Ross Taylor, a trustee and general manager of the Association, acquiring a land contract for ninety-three acres for cemetery purposes from Stecher. Taylor assigns this contract to the Company through Graber, Kyle, Bow and Thorne, for the acquisition of which land the Company obligated itself to pay $90,000. The Association entered into a contract to purchase this same land from the Company for the sum of $500,000.00 to be used for cemetery purposes. Disregarding for the moment the legal conclusion in respect to this set-up, we have the Company on the one hand officered by C. E. Kyle as Secretary of both companies, and the directors made up of either men who are Trustees of the Association, or their wives and relatives. On the other hand, we have the Association officered entirely by the same four men individual defendants with Taylor as constituting the full Board of Trustees. It would appear that the Association by its officers entered into a contract for the purchase of land from the Company which in fact and in effect was a purchase from themselves, although under the cloak and apparent protection of separate corporate entities.

By the terms of this contract of purchase as established by all the documents, Taylor transferred the Stecher contract to the Company and received 400 shares of its stock of the par value of $10.00 each. The Company loaned to the Association $8000.00 to evidence which notes were executed. The Association thereby obtained a loan of $8000.00 from the Company and contracted to purchase this land agreed to be sold by Stecher for $90,000.00 for the magnificent sum of $500,000.00.

At this juncture, the stockholders and officers of the Company put into the Company through this loan only the sum of $8000.00 and nothing more for the stock. It may be asserted that the Company and these four assignors of the Stecher contract to the Company were obligated under the land contract as further consideration for the stock but there was no express assumption of the obligation thereof or thereunder. This $8000.00 was repaid out of the proceeds derived from the sale of grave spaces in the original six acre cemetery. After the payment of this $8000.00 loan and interest, and it was paid, the stockholders of the Company and these four men had no financial investment therein whatsoever. It may be safely said that the Company upon payment of this loan, had no immediate obligations and had an asset of the purchase price of $500,000.00 coming from the Association under this contract.

So far as this record discloses, although the Company was incorporated to buy, sell and deal in real estate, it does not appear that it had any transactions in real estate other than those appertaining to the Association.

The contract between the Association and the Company specified the apportionment of the gross proceeds of the Association. The entire revenue of the Association, with the exception of a few incidentals, was derived from the sale of burial lots and graves in the cemetery. It was provided that the gross receipts should be apportioned five percent for endowment, thirty-five percent for care and maintenance, fifteen percent to the payment of the $8000.00 loan, ten percent for creditors and thirty-five percent to the Company to apply on this contract price for land. It was further provided that as soon as the loan and the creditors were paid and the obligations to Stecher of $90,000.00 then sixty percent of the gross receipts should be paid to the Company until the contract price was fully paid.

By the terms of the Stecher contract, it was agreed that Stecher would not be obliged to release any land for cemetery purposes covered by his contract until the sum of $10,000.00 had been paid, in which event he would release a parcel contiguous to the original six-acre cemetery. After the lapse of some time this $10,000.00 was paid and a parcel released, paid not by the Company, but from the proceeds of the sale of burial lots in the original six-acre cemetery, from which proceeds or gross receipts the Company by its contract simultaneously received thirty-five percent.

Taylor died in April, 1919, when C. E. Kyle was elected General Manager of the Association. Although of no great importance in the determination of this matter it was about this time that a contract was entered into whereby The Guardian Savings & Trust Company was engaged to act as Trustee of the funds of the Association with instructions and agreement to apportion and distribute the gross proceeds as above indicated.

As furnishing another small example of the manner adopted by these two corporations in their dealings with each other, in December, 1920, a resolution was adopted by the Trustees of the Association to purchase a small parcel of land 100 feet by something like 450 feet next west of the six acre parcel belonging to the Association and part of the original 100-acre tract. Stecher deeded this 100 feet direct to the Company and the Company deeded the same to the Association. The Association gave the Company a note for $5000.00. The Company paid Stecher $2000.00. The $5000.00 note was paid in due time from the pro-

ceeds of the Association derived from the sale of cemetery lots.

Some time prior to January 1, 1925, the County of Cuyahoga sought the right to build a sewer through this cemetery property, supposed by it then to include the entire frontage on Detroit Road. To the knowledge of all these individual defendants, application has been made for the exemption of all of this land from taxation on the ground that it was dedicated to cemetery purposes. The application made by the officers of the Association upon their representation that this land was the property of the Association had been granted. The county instituted an appropriation proceedings to condemn and acquire the right to construct and maintain this sewer. The Association instituted an action in injunction to restrain these proceedings on the claim that the entire land was devoted to cemetery uses and had been exempted from taxation for such purposes. The Association prevailed. Thereafter, as a result of negotiations the Association sold the right and privilege to the County to construct this sewer, the same right which the County had sought to obtain by an appropriation proceedings, for the sum of $25,000.00.

After paying an attorney fee or commission, the net proceeds to the Association was the sum of $22,500.00.

With a portion of this fund the Association made final payment of the obligation to Stecher of $90,000.00 the original contract price for said land. On January 23, 1925, Stecher endorsed in writing on the back of the so-called Stecher land contract a certification that this contract had been satisfied and discharged in full.

There was another transaction about which much was said during the hearing. It seems that the Association and the defendant, The Sanitary Mausoleum Company of Reading, Pa., on or about the year 1922, entered into a contract for the construction of a mausoleum on this cemetery property, the details of which are unimportant. It is sufficient to say that the Association agreed to permit the Mausoleum Company to construct a mausoleum of about 1000 crypts upon the land held then by the Association under contract from the Land Company. As part of this contract the Mausoleum Company agreed to pay ten percent of the gross receipts into a care and maintenance fund of which fund the Guardian Savings & Trust Company was made Trustee. This fund finally amounted to about $36,000.00. Thereupon the Association by resolution, authorized the granting of a loan by the Guardian bank to the Land Company out of this fund of the sum of $30,000.00. A mortgage was duly executed by the Company covering about one-half of the land held by the Association under the contract from the Company. By this program the $30,000.00 of the endowment fund created for the maintenance and care of the mausoleum was loaned by The Guardian Savings & Trust Company with authority from the Association to the Company. That money was received by the Company. It was a very small part thereof, if any, that was ever used for the benefit of the Association.

Time passed until the year 1931, when a new contract was entered into between the Association and the Company. The contract of 1919 has been denominated as the first contract or the $500,000.00 contract. The new contract of 1931 was designated during the hearing by someone as the $3,000,000.00 contract.

Some time prior to this date, some forty-six acres of the ninety-three-acre tract under contract was released to Stecher who in turn sold it to The Westwood Country Club Company with the agreement and reservation that whenever it was not desired or used for golf purposes, first opportunity should be given to the Association to purchase same for cemetery uses upon an appraisal value then to be established.

Credit was given by Stecher on this $90,000.00 for the forty-six acres at about $1000.00 per acre. The balance of the obligation to Stecher had long prior

to 1931 been paid out of the proceeds of and by the Association.

However, it was claimed by the Company that the Association would never be able to pay its obligation of $500,-000.00 and for that reason the new contract was entered into.

The interest charges for the years since 1919, on the $500,000.00 amounted to a large sum. It was the claim of the Company that after allowing for cash payments by the Association and allowing a credit for the forty-six acres which had been released to Stecher there remained due and owing under the first contract the sum of about $311,000.00 in 1931.

Without reciting further details as between these two companies this new contract provided that fifty percent of the gross revenue of the Association should be paid in satisfaction of the obligation to the Company, all of which arose out of the Stecher land contract. This fifty percent of gross proceeds should be paid so long as and until all lots in the cemetery were sold. It not only provided for the payment of this percentage of gross proceeds from the land then held by the Association, but the same percentage from the sale of burial lots of any and all lands hereafter acquired. The Company not only gathered its percentage from sale of lots in the original six acres owned by the Association prior to the date of the Stecher contract and the lands covered by this contract but stamped its lien upon all future acquisitions of land.

As a part of this contract the acreage remaining after the release of the forty-six acres to Stecher, was finally deeded in 1931 by the Company to the Association. Also, the $30,000.00 mortgage given by the Company for money out of the endowment fund of the mausoleum was assigned and assumed by the Association as its obligation.

Shortly after the execution of this new contract all stock of the Company, except four shares, held in the names of their wives or relatives, was transferred respectively to Graber, Kyle, Bow and Thorne. All moneys distributed thereafter went directly to them, the stockholders owning all the stock of the Company, except four shares, and at the same time the trustees of the Association. From 1931 to date, Graber. Kyle, Bow and Thorne, the only Trustees of the Association, distribute fifty percent by the terms of this 1931 contract of the gross receipts of the Association to Graber, Kyle, Bow and Thorne, the sole owners of all the stock, except four shares, of the Company.

According to its Secretary, the receipts of the Association up to July, 1936, amounted to $489,050.00. The Association paid cash to the Company on the first contract extending from 1919 to 1931, $96,271.85, and on the second contract since July, 1931, $68,520.54. The Company received from other transactions involving this real estate additional sums of $3000.00 on the deal for the 100 foot strip of land and $30,000.00 on the loan from the funds in the Guardian Bank. The total cash receipts of the Company from the proceeds and revenues of the Association almost exclusively derived from the sale of lots and graves amounted to approximately $200,000.00 thus far disclosed. Under the statute these funds should be in the treasury of the Association or invested by it as provided by law.

Accepting these figures as the limit of the amount of revenues of the Association distributed to the Company, i. e., to Graber, Kyle, Bow and Thorne, except for ten or twelve thousand dollars allegedly paid for stock several years after the organization of the Company, it represents clear profit to them. The Company had no other business nor property, no employees, no expense for office. Its sole excuse for existing was to serve as a conduit for funds of the Association into the hands of Graber, Kyle, Bow and Thorne.

This Company served no useful purpose but the interests of these four men. Taylor had the Stecher contract for land for the Association to be paid for by the Association. When he got it he was a trustee of the Association and it related to land for the uses and pur-

poses of the Association. Assigned by him to the Association with its right to contract for and buy land for its uses supplied the same basis of security for a loan of $8000.00 for the payment of which its certain receipts might likewise have been pledged. The conclusion that the interests of the cemetery was not the paramount incentive for the plan adopted is inescapable.

From the same source of evidence it appears that the endowment fund of the mausoleum does not now exceed $3000.00 unless the monies owing on the $30,000.00 mortgage assumed by the the Association amounting to over $27,-000.00 may be regarded as part of this care and maintenance fund, which cannot consistently be done.

The endowment fund of the Association itself at the time of the hearing amounted to $22,451.04. represented by some cash in bank and a greater portion by securities, the market value of which was not disclosed.

The foregoing is deemed sufficient to present the picture of the manner and method whereby this cemetery was conducted since 1919 and its future provided for and safe-guarded. Further detail might embellish the picture but could not serve to change the mechanics of the operations nor more clearly set forth the relations of the parties and the evident results of the methods employed, nor more clearly portray the preconceived purpose and plan.

The single inquiry before us, however, is whether this set-up or arrangement is inhibited by law. Whatever views anyone may entertain in respect to the moral rectitude of such proceedings is immaterial. Whatever was done and however it was done is material only to the extent that the facts are essential to determine the legality of the plan.

The cemetery now contains about fifty-four acres. Proof was offered that there is room for seven hundred graves per acre. Each burial lot contains four or more grave spaces. Grave spaces were sold for sixty or sixty-five dollars each. Assuming that these figures are the maximum, from the amount of the

gross receipts of the Association and from the other proof in the case, it is evident that thousands of grave spaces have been sold and many more thousands remain unsold.

Great concern was manifested by the plaintiffs in their own behalf and in behalf of the other lot owners in respect to the ultimate future of this cemetery when all the graves are sold. Attention was directed to the inconsequential amount of the endowment fund at the present time set aside for future care and maintenance. It is claimed that the failure to conserve all the proceeds over and above that expended upon such items as are provided for by law, must necessarily result in inadequate provision for the care and upkeep of the cemetery for the requisite period after the lots are all sold.

The plaintiffs contend that the conduct of the affairs of this cemetery Association was illegal. It is claimed that the distribution of funds beyond the necessary expenditures for the acquisition of the land at its fair market value and the adornment and improvement thereof with walks and drives and properly preparing same for the cemetary uses was inhibited by law. It is urged that the distribution of funds to the Company was contrary to law and in fraud of the lot owners in the cemetery. For which reasons it is claimed that further distribution to the Company or the individual defendants or either of them should be enjoined; that the contract between the Association and the Company be declared null and void and cancelled; that an accounting be had to ascertain the amount of funds of the Association each defendant illegally received and judgments rendered therefor; that title to the lands involved be quieted in the Association and such other relief as is deemed proper.

The defendants contend for the legality of all their actions and the legality of all proceedings of the corporate defendants. It is contended by them that it is perfectly legal to organize a corporation for profit for the purchase

and sale of real estate. That this Company had absolute right to purchase the Stecher contract. That having acquired it, the Company had full right to negotiate and sell that contract to the Association upon any such terms as may be agreed upon between the parties. That the Association had full right to purchase additional land for cemetery purposes. That they were two separate corporate entities qualified to do business in this State in their respective spheres. That the transactions had between the corporations were adversary. That no fraud either direct or constructive tainted such dealings and no transaction was had which in any way defrauded plaintiffs or in any way prejudiced their rights.

Cemetery associations not for profit are controlled and regulated by a chapter in the General Code of Ohio, being §§10093 to 10119-1, GC.

The plaintiffs claim that the entire program engaged in by these defendants and consummated by them over the years from 1919 to date are in direct violation of §10098, GC, which reads, so far as pertinent, as follows:

"HOW INCOME APPLIED:—After paying for such land future receipts and incomes of such company or association, whether from sale of lots, donations or otherwise, shall be exclusively applied to laying out, preserving, protecting and embellishing the cemetery and avenues leading thereto, the erection of buildings necessary for the cemetery purposes, and to paying the necessary expenses of the cemetery company or association. No debts shall be incurred except for original purchasing, laying out, inclosing and embellishing the ground and avenues, for which debts may be contracted not exceeding ten thousand dollars in the whole. * * * ".

First, it is contended that plaintiffs lack capacity to maintain this action. It is said that a lot owner has only an easement or right of burial but no such interest in the cemetery as will sustain an action such as this.

This is a corporation not for profit. Its right to exist is a grant from the State. Existing under favor of the State, it has such powers and is limited by such restrictions as the State prescribes. §§10098 and 10109, GC, confer a very substantial interest to lot owners in the event the income is misapplied or illegally distributed. They have an interest in the conservation of funds to the end that the cemetery be cared for and maintained as such. Their interest is better defined by the authority quoted:

"If a cemetery company has dedicated land for the burial of the dead, and has held out to lot owners that the entire cemetery will be forever under the protection of a perpetual corporation, charged with the duty of laying out and ornamenting the grounds, each lot owner has an interest in the entire ground of the cemetery to be kept as an entirety, and to be perpetuated and cared for by the corporate body."

10 Am. Jur. Sect. 10, page 492.
Citing Close v Glenwood Cemetery, 107 U. S. 466.
Oakland Cemetery Co. v People's Cemetery Association, 93 Tex. 569.

Also in 10 Am. Jur. Sec. 22, page 504, based upon the same authorities, it is stated:

"The right of the owner of a burial lot is not confined to the limits of his lot; he has an interest in the entire cemetery to the extent, at least, that the cemetery corporation is under a duty to execute a trust in maintaining the grounds as a cemetery perpertually or until it is relieved of this obligation through the action of the court or public authorities in discontinuing the cemetery."

It was asserted to be the law that a corporation for profit may own and operate a cemetery and an individual or

individuals may maintain a cemetery and sell lots for profit. Even if the law be thus, it is difficult to see in what manner that is helpful in this case. This case is concerned with a corporation not for profit organized under a Chapter of the General Code which deals exclusively with this subject and recites specifically what may be done and what may not be done.

Sec. 10098 directs how income shall be applied. §10109 specifies that its moneys shall not be distributed in certain ways, one of which is:

"No part of the proceeds of land sold, or of the funds of such a company or association, shall ever be divided among its stockholders or lot owners."

This restriction is followed by mandatory directions in respect to how its funds must be used.

For convenience the entire section follows:

Sec. 10109. HOW RECEIPTS AND INCOME APPLIED: The receipts and income of such a company or association, whether derived from the sale of lots, from donations, or otherwise, shall be applied to the payment for such lands, to the laying out, preservation, protection, and establishment of the cemetery, the avenues within it, to the erection of necessary buildings and to the general purposes of such company or association. No debts shall be contracted in anticipation of future receipts, except for the original purchase of the land and laying out, inclosing, and embellishing the grounds, and avenues therein. No part of the proceeds of land sold, or of the funds of such a company or association shall ever be divided among its stockholders or lot owners. All its funds must be used exclusively for the purposes of the company or association as above herein specified, or invested in a

fund, the income of which shall be so used and appropriated."

This chapter regulating cemetery corporations not for profit clearly contemplates that there shall be no profits to anyone, out of the █ funds of a cemetery corporation. Such is the law outside of Ohio as well as in Ohio.

"As has already been said, the law does not contemplate that cemeteries shall be operated for profit by either public or private corporations. All receipts and income of a cemetery company or association, whether from sales of lots, donations or otherwise, must, after paying for the land acquired, be applied exclusively to laying out, preserving, protecting and embellishing the cemetery and avenues leading thereto, the erection of buildings necessary for the cemetery purposes, and to paying the necessary expenses of the corporation. No part thereof or of the proceeds of land sold, may ever be divided among its stockholders or lot owners. Its funds must be used exclusively for the purpose of the company or association, or invested in a fund the income of which shall be so used and appropriated."

Volume 7, O. Jur. Cemeteries, §33.

"Where a cemetery corporation is formed under laws relating to the formation of corporations not for pecuniary profit, the members cannot make a profit for themselves out of the sales of lots or other revenue of the cemetery; nor can they make a gift of their revenue to another and independent corporation."

11 Corpus Juris, p. 53, Sec. 5.
Citing: Clark v Rahway Cemetery Co. 69 N. J. Eq. 636.

This no-profit rule receives expression in the form of corporation usually adopted. The deep seated source thereof springs from the fact that all but a

very few regard land dedicated to the burial of the dead as hallowed ground. True, there is some sentiment interwoven but a world without some sentiment would be cold indeed. There are only a few who are so devoid of sentiment and feeling that they are able to use a graveyard as an article of barter and sale for personal gain without moments of revulsion and remorse.

It is a cemetery conducted and operated according to law with the profit element removed that more certainly guarantees the active recognition of those factors that soothe and satisfy those who have sepultured their husbands or wives or other objects of their enduring affections therein. Such are profoundly interested that undivided and unrelenting attention be given to the proper care and upkeep of the cemetery and that such care and upkeep be assiduously maintained beyond the time when they are gone, to the end that the cemetery be perpetuated for succeeding generations. The no-profit rule was doubtless evolved as a result of long experience as most likely to assure the permanency of a cemetery with lasting care. Strict regard for the privileges and limitations prescribed by law by conscientious trustees whose actions are not adulterated with mercenary motives must result in the gradual creation and preservation of funds to insure the care and perpetuation of this cemetery.

If it be claimed that these payments of the association to the Company were not the distribution of funds as profits but payments upon a legal obligation to the Company agreed to be paid by contract for land, such claim must fail on the facts and law.

The facts in this case are unlike the facts in the case of **State ex rel v Meyers, 19 Oh Ap 436; 22 Abs 353.** In that case several individuals joined in buying land. They improved it in readiness for cemetery use. After the land was so improved, they sold same to the cemetery association, a corporation not for profit.

Whether the holding in that case is sustained by weight of authority is immaterial, as it is of no controlling effect in this case. Neither the Company nor the individual bought and improved this land ready for cemetery purposes and then sold same to the Association. It was the money of the Association that bought the land. It was its money as it came in that adorned and improved the property. The defendants did nothing substantial but loan the Association Eight Thousand Dollars ($8000.00) which the Association duly repaid.

It has been recently held in the case of **North v Higbee Company, 131 Oh St 507,** that the separate corporate entities of a parent and subsidiary corporation will not be disregarded in the absence of proof that the subsidiary was formed for the purposes of fraud. So the contracts of these two independent corporations should be recognized as well as their separate corporate existence until it appears that one was organized for the sole purpose of being used as a shield to do indirectly what its promoters and organizers could not legally do directly. The Association could not distribute its funds directly to its trustees. Hence they proceeded to organize this Company through which the same end was accomplished. This would not be so certainly true if this Company had had any other business or interest, or there had been other than these four really concerned, or if after the 1931 contract the real purpose and excuse for its existence has not been made plain when all the stock, except four shares, was transferred to the names of the real owners. This Company was the instrumentality whereby a fraud, whether actual or constructive, or whether so intended or not, was perpetrated upon the lot owners in this cemetery, by serving as a conduit for the illegal distribution of its funds.

There is another reason why the whole

scheme and plan is and was essentially illegal on its very face from the time of its original conception down through the years of its effective operation.

When Taylor obtained the Stecher contract in 1918, he was a trustee and general manager of the ▇ Association. The subject matter of the contract was land contiguous and surrounding the six-acre parcel then owned by the Association for cemetery purposes. This land was for the cemetery to be paid for by the Association. Unless Taylor is charged with a breach of trust, which could not be done by the defendants possessed of full knowledge at all times, this Stecher contract, the moment it was signed by Stecher, became the the property of the Association, not the property of Taylor. Taylor, however, assigns it to these four men and they assign it on the same day to the Company organized for the sole purpose of receiving it. Thereafter the Company sells the Association its own property for $500,000.00 which it already owned for $90,000.00. Whenever the time comes that trustees may legally do such things, it will be time to revamp the law in relation to the duties and obligations of trustees.

To sidestep the express provisions of the statute which forbids a contract for more than a ten thousand dollar ($10,000.00) debt, which has been audaciously and flagrantly violated, it is asserted there is no debt of the Association to the Company under the existing contract. If the Association is under no obligation to pay fifty percent of its gross income to the four defendants, why should the funds of the Association have been thus distributed in defiance of statutory inhibition since 1931? If no debt is created by this contract, if the Association does not owe the Company anything thereunder, then an order forever forbidding any distribution of funds by virtue thereof and a restoration of such funds as have been gratuitously distributed should evoke no complaint from the defendants.

It is further contended by the defendants that the law recognizes as valid contracts made by ▇ and between two corporations with overlapping directorates in the absence of fraud and lack of fair dealing. But, no case has been cited which approves a contract between corporations one of which was designedly organized for the sole purpose of attempting to render legal that which by statute is illegal to do by direct methods.

It is our conclusion that this contract to pay the Company fifty percent of the income of the As- ▇ sociation is illegal and void and in fraud of the rights of the lot owners in this cemetery and should be cancelled; that the lands covered by the Stecher contract less the acreage released to Stecher, should be quieted in the Association; that the officers of the Association be enjoined from any further distribution to anyone except for the purposes enumerated and so defined in the statutes; that an accounting be had to ascertain and determine the amount of money received by each ▇ of the individual defendants representing profits to them out of the funds of the Association for which sums the Association be awarded judgment against such defendants in such amounts as each illegally received, and that the cause be retained to await the result of such accounting. Decree for plaintiffs in conformity herewith. O. S. J. Exceptions may be noted.

TERRELL, J., concurs.

LEVINE, PJ., dissents.