DECISION
{¶ 1} Defendant-appellant Robert Merkle was found guilty by a jury of failing to maintain an endowment-care fund while operating a cemetery[1] and of two counts of theft.[2] The trial court sentenced him to eighteen months in prison. The trial court then denied Merkle's petition for postconviction relief, in which Merkle argued that he had received ineffective assistance of counsel. Merkle now appeals his convictions and the denial of his postconviction petition. We affirm.
 I. Wesleyan Cemetery {¶ 2} The United Methodist Church founded Wesleyan Cemetery in the Northside section of Cincinnati in the mid-1800s. The church ran the cemetery for many years, but by 1989 it no longer wanted to contribute its time and money. Peter Randolph, a local attorney, was asked to take over the responsibilities.
 {¶ 3} At trial, Randolph testified that when he was asked to take control of the cemetery, he consulted with an attorney, Robert Sexton, "the top cemetery attorney in the country." Randolph testified that Sexton told him that the cemetery was not in compliance with current Ohio law, and that Randolph needed to form a new and separate corporation.
 {¶ 4} Sexton wrote a letter to Randolph stating, "I propose that Wesleyan immediately take the legal steps necessary to be in material compliance with existing Codes. Thus, I advise the formal establishment of an Endowment Care Fund; a Burial Vault Fund; a modern set of Rules; and a Code of Regulations. I also advise certain filings with the office of the Ohio Secretary of State, in order to further file Amended Articles disclosing the intent to file for formal exemption in accordance with the Internal Revenue Code."
 {¶ 5} Randolph testified that he followed Sexton's advice. According to Randolph, in 1989, a new corporation was formed, with Randolph as president and with new corporate regulations and a new filing with the Ohio Secretary of State. The state introduced evidence at trial demonstrating that, in 1989, Randolph and his new board amended the existing articles of incorporation and filed them with the Ohio Secretary of State. This separate corporation was not affiliated with the United Methodist Church.
 {¶ 6} By 1995, Randolph no longer wanted to be responsible for the cemetery. He contacted Merkle, who had previously worked at the cemetery and had expressed an interest in running it. Merkle wrote a letter to Randolph stating his interest in becoming president of the cemetery corporation, though he also wrote in the letter that he would not be interested if "the United Methodist Church, Methodist Union or its legal representatives have any part in the Wesleyan Cemetery Inc."
 {¶ 7} Randolph and Merkle agreed that Merkle would become the new president for the cemetery corporation and would run the cemetery. Merkle also created a new board of directors, consisting of Merkle's wife, stepdaughter, stepson, and son-in-law. As soon as he became president, Merkle and his family moved into the house on the cemetery property. The board also approved an annual salary of $26,000 for Merkle.
 {¶ 8} Randolph testified that when he turned control of the cemetery over to Merkle, the cemetery had an account with PNC Bank containing about $93,000. Randolph testified that this money was an endowment-care fund for the cemetery. According to Randolph, the cemetery was subject to the Ohio law concerning endowment-care funds, which required that a minimum of $50,000 always be kept in the account, and that ten percent of any money received from a burial at the cemetery be placed in the account.[3]
 {¶ 9} Randolph testified that when he transferred control of the cemetery and its money to Merkle in 1995, he told Merkle that the PNC account was an endowment-care fund. Merkle testified that he was told by his predecessors that it was acceptable to spend account funds and to reduce the balance to $50,000.
 {¶ 10} Merkle testified that when he took over the cemetery, there were many problems. According to Merkle, the mowing equipment was missing, the construction equipment was in disrepair, and all of the financial records and many of the burial records were missing. Merkle testified that the basement of the house on the property had been flooded and a corner of the kitchen wall had collapsed, leaving a hole to the outside. In addition, due to neglect, the cemetery had sunken graves, downed trees, and many damaged tombstones.
 II. Follow the Money {¶ 11} Immediately upon assuming control of the cemetery assets on August 1, 1995, Merkle withdrew $30,000 from the PNC trust account and placed it in a PNC checking account. A month later, he transferred an additional $13,000 into the checking account, leaving approximately $50,000 remaining in the trust account. Within weeks of transferring the money to the checking account, all but $400 of the funds had been spent.
 {¶ 12} At trial, Merkle acknowledged that he had transferred the $43,000 from the PNC trust account, the endowment-care fund, to the PNC checking account as soon as he took over the cemetery, and that almost all of the $43,000 was gone in a few weeks. Merkle said that he had needed the money to maintain the cemetery, stating, "There was no other reason to spend it than for that."
 {¶ 13} The state presented numerous checks that Merkle had written on the PNC checking account. Detective William O'Brien of the Cincinnati Police Financial Crime Unit, the investigating officer on the case, testified that between August 2 and September 22, 1995, Merkle had written checks for $5,352 either for his salary or for his own personal expenses.
 {¶ 14} In September 1996, Merkle transferred the approximately $50,000 remaining in the PNC endowment fund into a Fifth Third Bank trust account. At about the same time, Merkle took out a $25,000 loan from Fifth Third in the name of Wesleyan Cemetery. The state presented all the checks Merkle had written on the Fifth Third account. Detective O'Brien testified that, between September 1996 and the end of December 1996, Merkle had spent $16,009 from the Fifth Third account on himself for salary and for other personal expenses.
 {¶ 15} As soon as he took out the loan from Fifth Third, Merkle had difficulty keeping up with the loan payments. In March 1997, he authorized the bank to use any income generated by the trust account to pay down the loan. When this still was not enough to keep up with the loan payments, in May 1999 Merkle used the principal of the trust account to pay off the loan. Merkle also made other withdrawals from the principal of the trust account.
 {¶ 16} Finally, in a series of transactions between May and December 1999, Merkle had all the remaining money in the Fifth Third trust account, about $37,000, transferred into a checking account at Columbia Savings Bank. By January 2000, the Columbia Savings checking account was exhausted.
 {¶ 17} Detective O'Brien testified that, between May and December 1999, Merkle had spent $15,299 on noncemetery purposes, specifically on his salary and on other personal expenses. Merkle acknowledged in his testimony that he had spent almost $35,000 of the cemetery money on his own expenses in 1999. Merkle himself had his accountant tally how much money in 1999 he had taken as salary ($15,325.70), and how much additional money he had used for personal expenses, ($19,498.20), money that he claimed had been taken as part of his salary.
 {¶ 18} Merkle testified that he was to be paid a salary only if the funds were available, stating, "Only after any pertinent expenses of the cemetery were paid was I to be paid." When asked at trial why he had received almost $9,000 more than his annual salary in 1999, Merkle answered, "Because you took your salary when it was available. The next month I may not have received anything or the next year."
 III. No More Money {¶ 19} In April 2000, Detective O'Brien began receiving calls from people with family members buried at Wesleyan Cemetery. They complained about the high grass and the terrible condition of the cemetery grounds. O'Brien contacted the Ohio Department of Commerce, Real Estate Division, and discovered that Wesleyan Cemetery had not registered for the years 1998-2000. O'Brien then visited the cemetery and observed grass two feet high and tree limbs lying among gravesites.
 {¶ 20} Detective O'Brien obtained a search warrant for the cemetery property, and he and other officers searched the property in May 2000. O'Brien seized all the cemetery's bank records, along with receipt books and burial records. O'Brien then subpoenaed bank records from PNC, Fifth Third, and Columbia Savings Bank.
 {¶ 21} Merkle was subsequently indicted on three counts of theft and one count of failure to maintain an endowment-care fund while operating a cemetery.[4] The indictment alleged that Merkle had taken more than $100,000 from Wesleyan Cemetery without the consent of the owner or person authorized to give consent (count one),[5] beyond the scope of the express or implied consent of the owner (count two),[6] and by deception (count three).[7]
 {¶ 22} The jury found Merkle not guilty of count one, but returned a guilty verdict on counts two and three, finding that Merkle had stolen $5,000 or more, but less than $100,000. The offenses were fourth-degree felonies. The jury also found Merkle guilty of failure to maintain an endowment-care fund, an unclassified misdemeanor. The trial court sentenced Merkle to the maximum sentence of eighteen months in prison.
 {¶ 23} Merkle filed a timely notice of appeal, but he requested a stay of appellate review pending the trial court's decision on his petition for postconviction relief. In his petition, Merkle argued that he had received ineffective assistance of counsel, and that proof of his claim involved evidence outside the record of the trial court's proceedings. Therefore, Merkle requested an evidentiary hearing on his petition.
 {¶ 24} The trial court denied Merkle's petition for postconviction relief. Merkle filed a second notice of appeal, and his two appeals have been consolidated by this court.
 IV. Sufficiency {¶ 25} In his first assignment of error, Merkle argues that the trial court erred by overruling his Crim.R. 29 motion for acquittal based on the insufficiency of the evidence. Whether the evidence is legally sufficient to sustain a verdict is a question of law.[8] Viewing the evidence in a light most favorable to the state, we must determine whether any rational factfinder could have found the essential elements of the crimes proved beyond a reasonable doubt.[9]
 A. Endowment-Care Trust {¶ 26} The endowment-care-trust statute states, "Any person desiring to operate any cemetery that is organized or developed after July 1, 1970, before offering to sell or selling any burial lot, burial right, entombment right, or columbarium right in that cemetery, shall first establish an endowment care [sic] trust, segregated from other assets, and place in that fund a minimum of fifty thousand dollars in cash or in bonds of the United States, this state, or any county or municipal corporation of this state."[10]
 {¶ 27} We initially note, contrary to Merkle's assertion, that Merkle was not exempt from the endowment-care-trust statute. Merkle does not dispute that he operated the cemetery beginning in 1995, and that the cemetery corporation had at least $50,000 when he took over. He also does not dispute that no money remained in trust by the end of 1999.
 {¶ 28} But though the statute exempts cemeteries run by "religious societies,"[11] there was no evidence presented at trial to support the finding that Merkle was running Wesleyan Cemetery as a religious society. It is clear that the United Methodist Church had no affiliation with the cemetery by the time Merkle was in charge, and Merkle's self-serving declarations that he had a "mission" as an unordained Methodist minister to run the cemetery meant nothing legally. And while the IRS determined that the cemetery was a nonprofit and charitable organization, this was not proof that the cemetery was run by a religious society.
 {¶ 29} In addition, the argument that because the cemetery had been in existence since the 1800s it was exempt from the endowment-care statute, is unavailing. In 1989, the cemetery corporation was reorganized, and a completely new corporation took over. Peter Randolph testified that he followed Sexton's legal advice, and new articles of incorporation and new regulations were filed with the Ohio Secretary of State. The previous manager of the cemetery, the church, had no affiliation with the new corporation. Therefore, when Merkle took control of the cemetery, he was required by law to maintain an endowment-care trust.
 {¶ 30} The endowment-care-trust statute does not specify a culpable mental state. When a statute "neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense."[12] "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."[13]
 {¶ 31} Randolph testified that he told Merkle that he must maintain an endowment-care fund. Merkle testified that he was told he could spend the money in the endowment-care fund as long as $50,000 remained in the account, and he did not dispute that he did not maintain the minimum of $50,000 in any cemetery account.
 {¶ 32} We conclude that a rational factfinder could have found beyond a reasonable doubt that Merkle had recklessly failed to maintain adequate funds in the endowment-care fund, and that there was sufficient evidence to overrule Merkle's Crim.R. 29 motion for an acquittal on the endowment-care charge.
 B. Theft {¶ 33} The theft statute, in relevant part, states, "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give consent; (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; (3) By deception." The state accused Merkle of stealing property valued at $100,000 or more but less than $500,000, third-degree felonies.
 {¶ 34} Merkle argues that the trial court erred in several respects when it did not grant his Crim.R. 29 motion on the theft charges. First, Merkle contends that the dollar amount he allegedly stole could not have been $100,000 or more. Merkle claims that the most the state could possibly have proved was that he stole the $93,000 originally in the PNC trust account. Second, Merkle argues that the state offered no evidence to prove that he took property without the consent of Wesleyan Cemetery, that he exceeded the scope of any consent of the cemetery, or that he engaged in deception to obtain cemetery funds.
 {¶ 35} We agree with Merkle that the state did not present sufficient evidence that he stole at least $100,000 from the cemetery funds. The state offered bank records and Detective O'Brien's testimony concerning the amount of money that Merkle had spent on himself, which totaled far less than $100,000. The state never argued that Merkle spent every penny under his control on himself. And we find too speculative the state's theory at trial that, left alone, the $93,000 in the PNC bank account would have earned enough interest over time to grow to at least $100,000.
 {¶ 36} But because the jury did not find that Merkle had stolen at least $100,000, instead finding that the value of the funds taken by Merkle was $5,000 or more but less than $100,000, the error was not prejudicial to Merkle and was harmless.
 {¶ 37} We do not agree with Merkle that the state presented insufficient evidence to prove that he took the cemetery money without the consent of the owner, beyond the consent of the owner, or by deception. First, the state presented testimony from three people who owned lots at the cemetery or who had loved ones buried in the cemetery. These people possessed property rights in the cemetery.[14] All three testified that they had never given Merkle permission to deplete the endowment-care fund.
 {¶ 38} Second, though the board voted to pay Merkle an annual salary, Merkle himself testified that he was to receive his salary only after the expenses for the cemetery were paid. The state presented the many checks Merkle wrote for personal expenses, such as for his grandson's high-school tuition, a model train set, and Merkle's satellite television provider. And the state demonstrated that Merkle had taken even more money for himself than was allotted to him as salary. A reasonable factfinder could certainly have concluded that Merkle had taken money that he did not have consent to take, that he had taken money beyond what he had consent to take, and that he had taken money by deception.
 {¶ 39} Finally, Merkle argues that there is a conflict between the endowment-care trust and theft statutes. Merkle reasons that because the conflict is irreconcilable, the specific endowment-care-trust provision must take precedence over the more general theft provision, and that the theft charges should have been dismissed.
 {¶ 40} Merkle cites State v. Volpe,[15] along with R.C. 1.51, in support of his claim. In Volpe, the Ohio Supreme Court held that a statute prohibiting the possession of a gambling device with purpose to engage in gambling took precedence over a more general statute prohibiting possession and control of criminal tools. The court held that because the two statutes provided different penalties for the same conduct, they conflicted.[16] And under R.C. 1.51, if such a conflict is irreconcilable, the specific statute must prevail over the general one. Therefore, the state was prevented from prosecuting the defendant under the general statute.[17]
 {¶ 41} But the Ohio Supreme Court later clarified that prosecution under a general statute is inappropriate only when the elements of the offenses correspond to such a degree that commission of the specific crime necessarily results in commission of the general crime:[18] that is, prosecution under both statutes is prohibited only if the two statutes define allied offenses of similar import.[19]
 {¶ 42} In Merkle's case, it is clear that one could fail to maintain an endowment-care fund while not committing theft. The elements of the two offenses are not even similar. Therefore, the two statutes did not define allied offenses, and the state's prosecution of Merkle for both offenses was not prohibited under R.C. 1.51.
 {¶ 43} Because all of Merkle's arguments fail, we hold that the trial court did not err when it denied Merkle's Crim.R. 29 motion for an acquittal. Therefore, we overrule his first assignment of error.
 V. Res Judicata {¶ 44} In his petition for postconviction relief, Merkle asserted that he received ineffective assistance of counsel. Because he claimed that the ineffective assistance of counsel could only be substantiated by evidence outside the trial court's proceedings, Merkle submitted supporting affidavits and documents along with his petition and requested an evidentiary hearing. The trial court denied Merkle's request for an evidentiary hearing and denied Merkle's petition, making two conclusions of law.
 {¶ 45} The trial court first concluded that because Merkle's claim could have been raised at trial, at sentencing, or on appeal, it was barred by res judicata. The court then concluded that Merkle's claim was not sufficiently supported by evidentiary documents. Merkle challenges each of these conclusions, respectively, in his second and third assignments of error.
 {¶ 46} Res judicata can be a proper basis upon which to dismiss a postconviction petition without a hearing.[20]
There are, however, several exceptions to the absolute application of the doctrine where ineffective assistance of counsel is claimed. The Ohio Supreme Court has stated that, generally, the introduction with a postconviction petition of evidence outside the record concerning ineffective assistance "is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of res judicata."[21]
 {¶ 47} Because Merkle submitted numerous affidavits and documents outside the record that, on their face, supported his claim of ineffective assistance of counsel, we conclude that he met the low threshold to avoid dismissal based on res judicata. Therefore, we hold that the trial court erred in ruling that Merkle's claim was barred by res judicata.
 {¶ 48} But this error is harmless because we affirm the trial court's denial of Merkle's postconviction petition based on the lack of evidentiary support. Accordingly, we overrule Merkle's second assignment of error.
 VI. Evidentiary Hearing {¶ 49} While we hold that, in general, the mere submission of supporting affidavits and documents will avoid a dismissal of a postconviction petition due to res judicata, it is not automatic that the submitted evidence will be enough to warrant an evidentiary hearing on ineffective assistance of counsel.
 {¶ 50} The burden was on Merkle to offer enough evidence to demonstrate that he had "substantive grounds for relief."[22] In making such a determination, the court should have considered Merkle's petition and his new evidence in addition to the entire trial court record.[23] For a claim of ineffective assistance of counsel, Merkle had to "submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and also that the defense was prejudiced by counsel's ineffectiveness."[24]
He must have offered more than broad assertions or general conclusory allegations.[25]
 A. Dempsey Affidavit {¶ 51} Along with his petition for postconviction relief and request for an evidentiary hearing, Merkle submitted numerous exhibits. The most compelling was the affidavit from James G. Dempsey. Dempsey was a retiree who volunteered to microfilm historical records, typically for churches and cemeteries. At first blush, Dempsey's affidavit seems to contain new information concerning where all the money went — information that could have been in Merkle's favor. But under closer scrutiny, we conclude that most of it was not new information, and what was new was not enough.
 {¶ 52} Dempsey was a defense witness in Merkle's trial, but testified only about the terrible condition of the cemetery in 1995 when Merkle took over, and about how Merkle improved the cemetery's appearance. At one point during direct examination, Dempsey volunteered that he "did reconstruct financial totals from the records that the prosecutor provided." Defense counsel asked, "That was back before 1995; is that correct?" And Dempsey clarified that he meant "recently." Defense counsel then asked Dempsey, "But you don't know — those records are not of your own knowledge, right? * * * You only know what you got by looking at the records; is that correct?" Dempsey admitted, "Correct, only the physical pieces of paper." Defense counsel then asked one more unrelated question and ended the direct examination.
 {¶ 53} In his affidavit, Dempsey stated that he had all the Wesleyan Cemetery business checking-account records, along with all the still-existing PNC, Fifth Third, Columbia Savings, and Star Bank records. In general, he claimed that he had spreadsheets detailing where all the money was spent. He claimed that the spreadsheets demonstrated that Merkle had spent large sums of money on cemetery expenses and not much on himself, which would seem to refute the state's evidence against Merkle.
 {¶ 54} We first look at Dempsey's financial calculations concerning the Fifth Third Bank account. At trial, Detective William O'Brien, the investigating officer on the case, testified that $49,000 was transferred from the PNC checking account to a Fifth Third checking account. O'Brien testified that he went through each check written on the Fifth Third account and determined that, between September 1996 and the end of December 1996, Merkle spent $16,009 on noncemetery items.
 {¶ 55} Dempsey claimed in his affidavit that "over $32,000" from the Fifth Third account was spent on cemetery renovations and on maintenance and operation of the cemetery from September 23, 1996, through December 31, 1996.
 {¶ 56} Doing the mathematics, we can see that Dempsey's affidavit offered no new information. Of the roughly $49,000 deposited in the Fifth Third account, Merkle apparently spent about $32,000 on cemetery expenses, and the rest, about $16,000, he spent on himself. Dempsey's affidavit merely restated the information in a way that sounded more favorable to Merkle, emphasizing what he spent on the cemetery, rather than on himself.
 {¶ 57} We next look at Dempsey's calculations for Columbia Savings Bank. At trial, the Columbia Savings Bank manager testified that Merkle had transferred a total of $37,200 from the Fifth Third checking account into the Columbia account. She based her testimony on the cemetery bank statements from Columbia Savings for May through December of 1999. O'Brien testified that, between May and December of 1999, Merkle spent $15,299 on noncemetery purposes.
 {¶ 58} In his affidavit, Dempsey stated that, between May and December of 1999, about $30,000 was deposited in the Columbia Savings account, strictly from burial-related proceeds. He then claimed that almost $34,300 was spent on cemetery maintenance and operation.
 {¶ 59} For the Columbia Savings monthly statements, there was one wire transfer in each month from May to December, totaling about $37,000, as the bank manager testified. The statements also showed about fifty other smaller deposits, many in increments of $500, which was what Merkle charged per grave. The sum of these other smaller deposits was about $36,000. Therefore, Dempsey's claim that Merkle deposited about $30,000 into the Columbia account from burial proceeds was consistent with evidence already in the record.
 {¶ 60} And if $37,000 was deposited into the Columbia account by wire transfers from Fifth Third Bank, and another $30,000-36,000 was deposited into the account from burial proceeds, then O'Brien's calculations that Merkle spent $15,299 on noncemetery purposes and Dempsey's calculations that Merkle spent $34,000 on cemetery purposes were not inconsistent. O'Brien testified that Merkle spent $15,299 on himself. It could be assumed that the balance, much more than $34,000, was properly used for cemetery purposes.
 {¶ 61} We conclude that Dempsey's affidavit did not introduce new evidence concerning the Columbia Savings account. It was, again, coming at the data from a different direction in an attempt to paint a more favorable picture of Merkle's expenditures, but with no new information.
 {¶ 62} Finally, we look at Dempsey's calculations concerning PNC Bank. At trial, the testimony showed that when Merkle took over the cemetery, a PNC account had about $93,000. He took $43,000 from the PNC account and put it in a new PNC checking account, created in August 1995. The $43,000 was spent by the end of September 1995. Evidence at trial indicated that Merkle spent $5,352 of the money on himself.
 {¶ 63} In his affidavit, Dempsey made no direct statement about the spending from the second PNC checking account from August until September 1995. He did claim, however, that, from August 1995 until September 1996, over $43,000 was spent on cemetery renovations, and almost $80,000 was spent on cemetery maintenance and operation (though he did not specify from what account). For the same period, Dempsey claimed that Merkle paid himself only $22,000 in salary.
 {¶ 64} Dempsey stated that this 13-month period (August 1995 to September 1996) was the same period used by the prosecution at trial, but that was incorrect. The only evidence presented by the state at trial covering that time period was the testimony about the first month or two of the new PNC account, from August 1995 until September 1995.
 {¶ 65} Therefore, although it seems Dempsey intended his calculations to refute the state's evidence, they instead presented unrelated evidence. This evidence could have been the type of new information Merkle needed to get an evidentiary hearing. But even if Dempsey could prove that Merkle paid himself only $22,000 in salary from August 1995 until September 1996, that was not enough to grant a hearing.
 {¶ 66} First of all, the state argued that Merkle was not entitled to any of the money as salary. The board of directors approved a salary of $26,000 a year for Merkle. But the board consisted of Merkle and his immediate family, all of whom paid little or no attention to cemetery finances and rubber-stamped whatever Merkle wanted to do. In addition, Merkle himself testified that he was to be paid a salary only if the funds were available. He testified, "Only after any pertinent expenses of the cemetery were paid was I to be paid."
 {¶ 67} But Merkle went to great lengths in his testimony to explain what a shambles the cemetery was in when he took over, with immediate needs for expensive repairs and renovations. He also testified that the cemetery was never profitable. Therefore, it is debatable, given the cemetery's needs and the suspect board approval, whether Merkle was justified or entitled to receive any salary out of the cemetery funds.
 {¶ 68} Second, Merkle admitted under direct examination that he spent almost $35,000 on himself in 1999, almost $9,000 more than his annual salary. Merkle himself had his accountant tally how much money in 1999 he took as salary ($15,325.70), and how much additional money he spent on personal expenses ($19,498.20), money that he admitted he also took as part of his salary.
 {¶ 69} Even if Dempsey could prove that Merkle received "only" $22,000 in salary from August 1995 through September 1996, there remained sufficient evidence to prove that Merkle took a significant amount of the cemetery's money for his own personal use.
 {¶ 70} In sum, we are not persuaded that Dempsey's financial calculations in his affidavit presented enough new evidence to change the outcome of the case for Merkle. The evidence could have perhaps put Merkle in a more positive light, by emphasizing all that he did for the cemetery and how the majority of the money was spent on cemetery expenses. But Dempsey's affidavit did not present much new evidence, and what new evidence it did present was not enough to demonstrate that Merkle received ineffective assistance of counsel or was prejudiced by counsel's actions.
 {¶ 71} Dempsey's financial claims were the most compelling evidence offered with Merkle's postconviction petition. Dempsey also claimed to have statistics showing the decline in business at the cemetery. While such evidence would have certainly contributed to the defense theory that Merkle simply was the victim of bad luck and bad business decisions, there was already testimony presented at trial about the declining sales and income for the cemetery. In our view, the additional evidence of Dempsey's statistics did not demonstrate that defense counsel was incompetent or that Merkle was prejudiced by his counsel.
 B. Endowment-Care Fund {¶ 72} Merkle also submitted evidence supporting his theory that he was exempt from the endowment-care-trust statute. In Dempsey's affidavit, he claimed that he had a "lengthy conversation with Tim Long, Attorney at Law, who told me that, based upon the information that I had given him, it was his opinion that Wesleyan Cemetery was exempt from needing an `Endowment-care Fund.'" It is not clear whether Merkle was aware of this opinion at the time he was running the cemetery.
 {¶ 73} And, in his affidavit, Merkle claimed that, in 1999, he sought legal advice from Gerald Shaw, an attorney in Aberdeen, Ohio, about whether Wesleyan Cemetery was subject to the endowment-care-trust statute. With his petition, Merkle submitted a letter Shaw wrote to Merkle's attorney in 2001. Shaw admitted in the letter that he was "not an expert in the laws governing cemeteries in Ohio," but stated that he had told Merkle that "since the cemetery [Merkle] operated had been in existence prior to July 1, 1970 he would not be governed or restrained by R.C.1721.21." We note that Merkle did not introduce, at trial or with his postconviction petition, formal affidavits stating these legal opinions.
 {¶ 74} We have already determined that Merkle was required to comply with the endowment-care-trust statute. We are not persuaded otherwise by Merkle's reference to legal opinions stating that he was exempt.
 {¶ 75} Merkle fails to specifically state how presentation of these legal opinions would have changed the outcome of his trial. Perhaps he reasons that the opinions demonstrated that he lacked the requisite mental state of recklessness when he failed to maintain the $50,000 minimum in the endowment account.
 {¶ 76} There are several problems with this argument. First, Merkle stated at trial that he felt he was exempt from the endowment-care-trust requirement because he operated the cemetery as a religious society. Shaw's opinion stated that Merkle was exempt because of the age of the cemetery.
 {¶ 77} Second, Randolph testified at trial that he told Merkle that he was required to maintain an endowment-care fund. And Merkle admitted that he was told that he could spend from the endowment-care account as long as it retained a $50,000 balance. Plus, for several years, Merkle did maintain the $50,000 minimum.
 {¶ 78} We conclude that, despite the conflicting opinions demonstrated by the new evidence, the overall evidence indicated that Merkle was sufficiently aware of the possibility that he had to comply with the endowment-care-trust requirement and also that he did try to comply with it for a while. Besides, ignorance of the law was no excuse. Merkle simply acted recklessly when he ignored the consequences of a known risk and chose not to comply with the endowment-care-trust statute.
 {¶ 79} Merkle spent pages in his postconviction petition arguing that his trial counsel did not somehow reveal, either through cross-examination or through other evidence (what evidence we do not know), that Randolph did not actually establish an endowment-care fund, even though he testified that he had. But even if Randolph failed to maintain an endowment-care fund, that would not have absolved Merkle. Merkle was required to comply with the law and was required to maintain an endowment-care trust.
 {¶ 80} Therefore, we are not persuaded that the evidence submitted by Merkle indicating that he was told he was exempt from the endowment-care-trust statute demonstrated that his trial counsel was ineffective or would have changed the outcome of his trial.
 C. Merkle Family Affidavits {¶ 81} Merkle also offered the affidavits of three of his family members who served on the cemetery board with him and who were witnesses for the defense at his trial. Merkle's wife, Bonnie Merkle, his stepdaughter, Diana Sams, and his stepson, Donald Evans, all stated in their affidavits that Merkle's counsel did not talk to them prior to trial, did not prepare their testimony, did not tell them what questions he would ask at trial, and did not go over any testimony with them.
 {¶ 82} Merkle offered no evidence even suggesting what testimony his family members wished to offer that could have changed the outcome of his trial. Even if he had, the Ohio Supreme Court has held that a court considering a postconviction-relief petition need not accept affidavits as true statements of fact.[26] The court may judge the credibility of any affidavit, based on relevant factors, one of which is whether the affiants are relatives of the petitioner or otherwise interested in the success of the petitioner's efforts.[27]
 {¶ 83} Most attorneys would probably meet with their witnesses before trial and at least discuss in general the main points of their expected testimony. But without knowing what Merkle's family members wanted to testify about, counsel's failure to meet and discuss the testimony with them before trial did not necessarily mean that his performance fell below an objective standard of reasonable competence, or that, but for such deficiency, the outcome of Merkle's trial would have been different.
 {¶ 84} Therefore, the affidavits of Merkle's family members did not support Merkle's assertion that he deserved an evidentiary hearing on his claim of ineffective assistance of counsel.
 D. Failure to Offer Other Evidence {¶ 85} Finally, Merkle argued in his postconviction petition that his trial counsel failed to offer evidence that was favorable to Merkle. With his petition, Merkle submitted a flyer made to advertise the cemetery and a proposal from a company to build a mausoleum complex at the cemetery. He also submitted a letter from the Small Business Development Center of the University of Cincinnati following up on free business-management consulting Merkle had received. Merkle argued that this evidence showed that he was trying to make legitimate attempts to run the cemetery profitably.
 {¶ 86} But this and other "favorable" evidence submitted were simply not enough to demonstrate that Merkle's counsel was incompetent or that Merkle was prejudiced by his counsel's representation. Merkle was convicted of failure to maintain a cemetery endowment-care fund and of theft. Even if the jury had been given evidence that Merkle was trying to promote the cemetery business in numerous ways, such evidence would not have countered the ample evidence presented by the state showing that Merkle had spent all the cemetery money, much of it on himself.
 {¶ 87} In sum, Merkle did not submit sufficient evidence along with his petition for postconviction relief to warrant an evidentiary hearing. The evidence submitted was not enough to show that Merkle had substantive grounds for relief — that is, it was not enough to demonstrate that he lacked competent trial counsel and that he was prejudiced by his counsel's ineffectiveness.
 {¶ 88} Therefore, we overrule Merkle's third assignment of error. We affirm the trial court's denial of Merkle's request for an evidentiary hearing and its denial of Merkle's postconviction petition.
Judgments affirmed.
Winkler, P.J., and Hildebrandt, J., concur.
[1] R.C. 1721.21.
[2] R.C. 2913.02(A)(2) and (3).
[3] R.C. 1721.21.
[4] R.C. 1721.21.
[5] R.C. 2913.02(A)(1).
[6] R.C. 2913.02(A)(2).
[7] R.C. 2913.02(A)(3).
[8] See State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541.
[9] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[10] R.C. 1721.21(C).
[11] R.C. 1721.21(H).
[12] R.C. 2901.21(B).
[13] R.C. 2901.22(C).
[14] See Newell v. Cleveland Cemetery Assn. (1939),135 Ohio St. 657, 22 N.E.2d 414, affirming Newell v. Cleveland CemeteryAssn. (1938), 61 Ohio App. 476, 22 N.E.2d 847.
[15] (1988), 38 Ohio St.3d 191, 527 N.E.2d 818.
[16] Id. at 193.
[17] Id. at 194.
[18] See State v. Chippendale (1990), 52 Ohio St.3d 118, 120,556 N.E.2d 1134.
[19] Id.
[20] See State v. Cole (1982), 2 Ohio St.3d 112, 113,443 N.E.2d 169; State v. Perry (1967), 10 Ohio St.2d 175,226 N.E.2d 104, paragraph nine of the syllabus.
[21] See State v. Cole, supra, at 114.
[22] See R.C. 2953.21(C).
[23] Id.
[24] See State v. Jackson (1980), 64 Ohio St.2d 107, 111,413 N.E.2d 819.
[25] Id.
[26] See State v. Calhoun, 86 Ohio St.3d 279, 284,1999-Ohio-102, 714 N.E.2d 905.
[27] Id. at 285.