[Cite as *State v. Cephas*, 2019-Ohio-52.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO


STATE OF OHIO,

    Plaintiff-Appellee,

  vs.

ERNEST CEPHAS,

    Defendant-Appellant.

APPEAL NO. C-180105
TRIAL NO. B-1603911

*O P I N I O N.*


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  January 11, 2019


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1} Defendant-appellant Ernest Cephas appeals from convictions for two counts of felonious assault under former R.C. 2903.11(A)(2), with accompanying firearm specifications, and one count of having weapons while under a disability under R.C. 2923.13(A). We find no merit in his six assignments of error, and we affirm his convictions.

### I. Factual Background

{¶2} The record shows that on July 13, 2016, at approximately 5:45 p.m., Timothy Reed parked his car near his mother's house on Whetsel Avenue in Madisonville. As he bent over to get his two-year-old grandson J.N. out of his car seat, a car drove by and Reed collapsed. He was shot twice in the abdomen, and his grandson was shot in the head.

{¶3} Robveisha Gaines, Reed's daughter and J.N.'s mother, was also in the car. She was on the passenger side, and when she bent down to get her other child out of the car, she heard gun shots. She also heard J.N. screaming but did not realize that he had been shot. Gaines went to the driver's side of the car, believing that Reed had just fallen. But when Reed moved, she saw blood on his white shirt. Then, Gaines discovered that J.N. had been shot, and she started screaming and crying. When police arrived, she told them that she thought the shots were fired from a red truck with tinted windows.

{¶4} Darryl Starr had lived in Madisonville his entire life, and he knew Reed from living in the neighborhood. Starr had taken a day off from his job as a mail carrier and was driving through the neighborhood. He was travelling west on Chandler Street. When he stopped at the stop sign at the intersection of Chandler

Street and Whetsel Avenue, he saw Reed standing 20 to 30 feet away. Starr then saw a red car make a U-turn at the intersection in front of him.

{¶5}  Starr heard a series of "pop-pop" sounds, and he saw smoke coming from where Reed was located. He turned on to Whetsel Avenue and pulled up beside Reed. Starr said, "Man, what, you got some bad fireworks or something?" Reed just looked at him and then fell to the ground. Starr called 911 and went to assist Reed.

{¶6}  Keyasha Spikes was a mail carrier working in Madisonville on the day of the shooting. She was walking southbound on Ravenna Street crossing Chandler Street when she saw a dark green four-door car make a "really big" U-turn. As Spikes got to the sidewalk, she heard a gunshot. She stopped walking, and then she heard two more gunshots and a woman screaming.

{¶7}  Because Spikes was a nursing student, she got into her vehicle and drove toward Whetsel Avenue to see if she could help. She drove southbound on Ravenna Street. Spikes said that when she turned left onto Desmond Street, "[T]he car almost hit me dead-on." She parked her vehicle and went to the scene of the shooting where she saw Reed with blood surrounding a hole in his shirt. Because Reed was breathing, she did not believe she could do anything for Reed, and she was going to leave the scene.

{¶8}  But Spikes heard Gaines screaming about her baby, and saw J.N. in the back seat of the car. She saw that the child was slumped over and surrounded by blood, but that he was breathing. She saw Starr, whom she knew, and told him to call for help because her phone was dead.

{¶9}  Mark Osika was a probation officer with the Hamilton County Adult Probation Department. He was working at a satellite office in Madisonville when he

3

heard a broadcast about the shooting on a police radio. The satellite office was just three blocks away, and Osika could see the commotion from his office door.

{¶10} Osika immediately drove to scene. A number of bystanders were present, but he was the first public official to arrive. He saw a man lying on the ground with blood on his shirt. He also saw a baby, injured but still breathing, in the back seat of the car. At 5:49 p.m., Osika sent a radio broadcast advising that he was at the scene. Three minutes later, he sent another broadcast stating that the shooter was seen in a green vehicle going north on Whetsel Avenue.

{¶11} Cincinnati Police Officer Germaine Love responded to the scene. The officer saw Reed lying on the ground and retrieved J.N. from his car seat to provide trauma care. He saw an injury to the child's right side at the hairline. Subsequently, the fire department arrived and Officer Love placed the infant in their care.

{¶12} Officer Love also identified an "Incident Recall Report," which documented all communications associated with the shooting. The report showed that at 5:46 p.m., the call came in that a male subject had been shot in the street. A description of a red vehicle last seen on "Whetsel towards Kenwood" and of a black male with a light complexion was provided at 5:48 p.m. At 5:49 p.m., a hysterical female called and reported that a baby had been shot. At 5:50 p.m., there was another report of the shooter being in a red vehicle. Osika's broadcast at 5:52 p.m. reported that the shooter was in a green vehicle going northbound on Whetsel Avenue. At 6:04 p.m., a broadcast went out stating that the suspect vehicle was an older green four-door with its back window completely shot out. It was seen on Luhn Avenue, which runs into Whetsel Avenue, and then headed northbound on Stewart Road. At 6:26 p.m., a call came to a nonemergency number stating that "suspect vehicle seen on Steward getting on South 71, no plate, green Buick, late 90s early

4

2000s." Finally, at 6:35 p.m., a report came in to District Two that "vehicle is hunter green with tan interior, male black driver, tall, fade haircut, white tee."

{¶13} Jennifer Long lived with her family on Luhn Avenue. On the evening of July 13, 2016, she was outside getting ready to go to the store when she heard three gunshots. She was going out her front gate when a green four-door car "flew" past her. The back window of the car had been shot out and had shattered glass at the bottom of the window. Long watched the car go through a stop sign at Luhn Avenue and Stewart Road. It then made a right turn onto Stewart Road and almost hit another car. Long said the car had only one occupant. The driver was an African-American man, who wore a red shirt, and had "compacted" hair that was "flat to the head."

{¶14} Kimberly Gray was at her home when she saw a news alert about a shooting in Madisonville. She called the nonemergency number at District Two to report what she had seen while driving home from work. Sometime between 5:45 and 5:55 p.m., she was driving in the right-hand lane on southbound I-71. As she approached the Stewart Road entrance ramp, she saw a hunter green vehicle with a tan interior. The car's back window had been shattered, and the glass that was still attached was waving in the wind. Gray described the driver as an African-American male with a buzzed haircut, wearing a white shirt. After Gray exited from the interstate, the car continued going south on I-71.

{¶15} Ebony Boyd is the mother of Cephas's two-year old-son. She described her relationship with Cephas as "on-and-off." Boyd owned a green Oldsmobile that she let Cephas drive, although she did not know if he had driven it on July 13, 2016. Boyd testified that early that day, she had received a call from Cephas about a flat tire, and that he had sounded distraught. She told him that she could not come

immediately to help because she had to go to work. After she got to work, she tried to call Cephas, but got no answer.

{¶16} Cindy Cephas, Cephas's mother, received a "confusing" call from him as she was making dinner between 5:00 and 6:00 p.m. on July 13, 2016. She said that he seemed "disturbed by something." The phone call was brief because they were disconnected. Dionne Lewis, Cephas's sister, was present at their mother's house when Cephas called. She became upset because when she attempted to call her brother, she could not reach him.

{¶17} Subsequently, Lewis saw a news report on television about a shooting in Madisonville, which had advised viewers to be on the lookout for a green car. Lewis knew that her brother sometimes drove a green car. She left her mother's house and drove to the scene of the shooting on Whetsel Avenue.

{¶18} Cincinnati Homicide Police Detective Kim Kelly was present at the scene when Lewis arrived. Kelly described Lewis as very anxious and concerned. Lewis told her about the call that Cephas's mother had received. Lewis said that Cephas was upset and crying. He had told his mother that "something bad happened" and that he was not "gonna see you guys for a long time." Lewis also told Kelly that Cephas drove a green four-door Oldsmobile, and that Cephas had a long-standing feud with someone in Madisonville.

{¶19} Detective Kelly also talked by phone with Cephas's mother and with Boyd. They told Kelly where Cephas might be located. Detective Kelly then obtained a warrant to search the residence where Cephas was staying. When police went to the apartment, they found Cephas inside. His clothing was photographed before it was seized. Police then took Cephas to the police station to be interviewed.

{¶20} In the parking lot of the apartment building where Cephas was staying, the police found the green Oldsmobile with a shattered back window. Inside the apartment, they found a license plate, two boxes of .9 mm ammunition, a receipt bearing Cephas's name, multiple cell phones, an I-pad, and scales. They also found a damaged HTC cell phone within a pile of clothing.

{¶21} The police sent the HTC phone to Binary Intelligence, an outside company with expertise at retrieving data off of electronic devices. Digital Forensic Specialist Jim Swauger generated a "UFED Cellebrite Report" from the data recovered from the phone. The report showed that Cephas made many calls to Boyd's phone from the morning of July 13, 2016, to the morning of July 14, 2016. Swauger was also able to recover some texts that had originally been deleted. Shortly after the shooting, Cephas sent texts to several individuals telling them that he loved them and to "[w]atch the news." He added, "My life wasn't supposed to be like this." At 12:51 a.m. on July 14, Cephas sent a text to Boyd that stated, "Police ask you, you busted my window out."

{¶22} The police also obtained a warrant to search the green Oldsmobile. A cup holding a .9 mm casing, a cell phone, a black baseball cap, and a sample of glass from the back window were recovered from the car. A forensic scientist determined that it was possible that glass found near the scene of the shooting could have come from the green Oldsmobile. The scientist also indicated that gunshot residue was found on the steering wheel of the Oldsmobile, on the baseball cap removed from the car, and on the t-shirt that Cephas had been wearing when he was arrested. A serologist determined that Cephas was a major contributor of the DNA located on the steering wheel of the car.

## II. Invited Error

{¶23} In his first assignment of error, Cephas contends that the trial court erred in admitting into evidence statements by a victim who did not testify. Specifically, he argues that the trial court violated his right to confront the witnesses against him by allowing Detective Kelly to testify about statements made by Reed, who did not cooperate with police or testify at the trial. This assignment of error is not well taken.

{¶24} The record shows that if any error occurred, it was invited error. Under the invited-error doctrine, a party cannot take advantage of an error that the party invited or induced the trial court to make. *State v. Bey*, 85 Ohio St.3d 487, 493, 709 N.E.2d 484 (1999); *State v. Pennington*, 1st Dist. Hamilton Nos. C-170199 and C-170200, 2018-Ohio-3640, ¶ 54. The statements were not elicited by the state in its direct examination. Instead, Cephas's counsel asked Detective Kelly about those statements during his cross-examination. Then, on redirect examination, the state questioned Kelly further about Reed's statement. Cephas objected at that time, but he had already opened the door for that testimony. Consequently, Cephas invited the error. *See In re Bailey*, 1st Dist. Hamilton No. C-990528, 2001 WL 477069 *1 (May 3, 2001) (the term "opening the door" is based on the doctrine of invited error).

{¶25} Even if it was not invited error, any error was harmless because Reed told Kelly that he could not identify the shooter because he did not get a good look at him. *See State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976), paragraph seven of the syllabus; *State v. Robinson*, 1st Dist. Hamilton No. C-060434, 2007-Ohio-2388, ¶ 16. Consequently, we overrule Cephas's first assignment of error.

### III. Photograph/Evid.R. 403

{¶26} In his second assignment of error, Cephas contends that the trial court erred in allowing unfairly prejudicial photographs into evidence. He argues that the court should not have admitted a photograph of the injured child that showed the child's full body with medical tubing, because it was cumulative to a photograph already admitted and served only to inflame the jury. This assignment of error is not well taken.

{¶27} Under Evid.R. 403, the decision whether to admit photographs into evidence lies within the trial court's discretion. Gruesome photographs are admissible at trial as long as their probative value is not substantially outweighed by the danger that the accused will be unfairly prejudiced. *State v. Maurer*, 15 Ohio St.3d 239, 264-265, 473 N.E.2d 768 (1984); *State v. Miller*, 1st Dist. Hamilton No. C-010543, 2002-Ohio-3296, ¶ 13.

{¶28} The trial court held a hearing on the two photographs the state presented to prove the child's injuries. The first, to which Cephas did not object, showed the child's head. Cephas did not object to its admission, stating that it "does an excellent job of covering up some of the medical instruments that are being run to help the child." But Cephas contended the second photograph was unduly prejudicial because it showed "the full body and medical tubing and all the necessary medical supplies plugged into the child."

{¶29} The state indicated that it had 24 pictures of the infant, and that it had selected two as a representation of the child's injuries. Because Cephas was charged under both former R.C. 2903.11(A)(1) and (A)(2), the state had to prove both serious physical harm and physical harm by means of a deadly weapon. The state represented that the two selected photographs "support[ed] those elements."

9

{¶30} The trial court stated that because the state had the burden to prove serious physical harm, the two photographs would be admitted. Our review of the record shows that the second photograph was not needlessly cumulative, and the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice to Cephas. We cannot hold that the trial court's decision to admit the second photograph was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See State v. Smith* 80 Ohio St.3d 89, 108-109, 684 N.E.2d 668 (1997); *State v. Morales*, 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267 (1987); *Miller*, 1st Dist. Hamilton No. C-010543, 2002-Ohio-3296, at ¶ 13-15. Therefore, we overrule Cephas's second assignment of error.

### IV. Ineffective Assistance of Counsel

{¶31} In his third assignment of error, Cephas contends that he was denied the effective assistance of counsel. He argues that his counsel made harmful concessions and was not prepared to finish the trial. This assignment of error is not well taken.

{¶32} A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 36. To sustain a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

{¶33} First, Cephas takes issue with his counsel's statements in opening arguments. Counsel stated that Cephas had "struggled throughout his entire life

with substance abuse, both narcotics and alcohol" and that he had "dealt drugs in the past only to facilitate his need, his addiction and to make sure that he had a constant supply to use." Counsel also stated that Cephas had "tried to recover numerous times throughout his life." He added that the day of the offense "started off horribly for Mr. Cephas" for a number of reasons including that he had "begun using narcotics again." The record shows that counsel's admissions were tactical decisions, and Cephas has failed overcome the presumption that those admissions were sound trial strategy. *See Strickland* at 689; *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 51.

{¶34} At the sentencing hearing, Cephas complained that his counsel "misrepresented" him because counsel "wasn't in his right mind because his wife had a miscarriage in the middle of trial." Cephas also complained that counsel had spoken with Cephas's family about Cephas being suicidal, that counsel had never discussed discovery with him, and that discovery was withheld from him. The record contains no support for any of these assertions. They involve matters outside the record, which we cannot consider on direct appeal. *See State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus; *State v. Fields*, 1st Dist. Hamilton No. C-090648, 2010-Ohio-4114, ¶ 15; *State v. Merkle*, 1st Dist. Hamilton Nos. C-020454 and C-030557, 2004-Ohio-1913, ¶ 44-47.

{¶35} The record shows that Cephas's counsel provided him with a diligent and thorough defense. He has not demonstrated that counsel's performance fell below an objective standard of reasonableness or that, but for counsel's unprofessional errors, the results of the proceeding would have been otherwise. Therefore, he has failed to meet his burden to show ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687-689, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Hackney* 1st

Dist. Hamilton No. C-150375, 2016-Ohio-4609, at ¶ 37-38. Consequently, we overrule Cephas's third assignment of error.

### V. Weight and Sufficiency

{¶36} In his fourth assignment of error, Cephas contends that his convictions were not supported by sufficient evidence. He argues that no witness ever identified him as the shooter and that no physical evidence placed him at the scene of the shooting. He also points to various inconsistencies in the testimony of the state's witnesses, most notably that some witnesses had stated that they had seen a red car at the scene, rather than a green car. This assignment of error is not well taken.

{¶37} The state's evidence was circumstantial, but circumstantial evidence and direct evidence have the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus; *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 39. Further, no rule of law exists that a witness's testimony must be corroborated by physical evidence. *Durgan* at ¶ 39. Any inconsistencies in the witnesses' testimony goes to credibility, and in deciding if the evidence was sufficient we neither resolve evidentiary conflicts nor assess the credibility of witnesses. *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 45.

{¶38} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found the elements of two counts of felonious assault under R.C. 2903.11(A)(2), the accompanying firearm specifications, and one count of having weapons while under disability under R.C. 2923.13(A)(3). Therefore, the evidence was sufficient to support his convictions. *See Jenks* at paragraph two of the syllabus; *Hackney*, 1st

Dist. Hamilton No. C-150375, 2016-Ohio-4609, at ¶ 29. Consequently, we overrule Cephas's fourth assignment of error.

{¶39} In his fifth assignment of error, Cephas contends that his convictions were against the manifest weight of the evidence, raising the same arguments as in his fourth assignment of error. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. Therefore, the convictions are not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 451 (1997); *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 25 (1st Dist.). Any inconsistencies in the witnesses' testimony went to credibility, and matters as to the credibility of evidence are for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *State v. Wright*, 2017-Ohio-1568, 90 N.E.3d 162, ¶ 59 (1st Dist.). We overrule Cephas's fifth assignment of error.

### *VI. Sentencing*

{¶40} Finally, in his sixth assignment of error, Cephas contends that the record does not support the sentence imposed by the trial court. He argues that the trial court erred in imposing lengthy consecutive sentences. This assignment of error is not well taken.

{¶41} Before a reviewing court can modify or vacate a felony sentence, it must clearly and convincingly find that the sentence is contrary to law or that the record does not support the sentencing court's findings. R.C. 2953.08(G)(2); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1; *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.).

**{¶42}** The sentences imposed were within the statutory ranges for second-degree and third-degree felonies. *See* R.C. 2929.14(A)(2) and (3). Further, while the trial court is required to consider the purposes and principals of sentencing and the various factors under R.C. 2929.11 and 2929.12, it need not make specific findings. We can presume from a silent record that the trial court considered the appropriate factors unless the defendant affirmatively shows that the court has failed to do so. *State v. Patterson*, 1st Dist. Hamilton No. C-170329, 2018-Ohio-3348, ¶ 60; *State v. Bohannon*, 1st Dist. Hamilton No. C-130014, 2013-Ohio-5101, ¶ 7. Cephas has not demonstrated that the court did not consider the appropriate factors.

**{¶43}** As to the consecutive sentences, Cephas argues that the trial court did not make the findings required by R.C. 2929.14(C). When imposing consecutive sentences, a trial court must make the required findings as part of the sentencing hearing and incorporate those findings into the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. The court need not use "talismanic words," but the record must show that the court engaged in the requisite analysis and that evidence exists to support the findings. *State v. Schwarm*, 1st Dist. Hamilton No. C-160677, 2017-Ohio-7626, ¶ 15; *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 56.

**{¶44}** The trial court incorporated its findings into the judgment entry. Cephas's complaint is that they were not made at the sentencing hearing. After listening to all parties, the court indicated that Cephas had "been to prison on two prior occasions" before setting forth the sentences on the individual counts. Then, before imposing consecutive sentences, it stated:

> The Court notes that the sentence is necessary to protect the public
> from future crime and/or to punish the offender. It is not

14

disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public, and the offender's history of criminal conduct demonstrates it's necessary to protect the public from future crime by the offender.

{¶45} Thus, the record shows that the court engaged in the requisite analysis and made the findings at the sentencing hearing to justify the imposition of consecutive sentences. The record supports the court's sentencing findings, and we cannot hold that the sentences imposed were contrary to law. Consequently, we overrule Cephas's sixth assignment of error.

### *VII. Summary*

{¶46} In sum, we find no merit in Cephas's arguments. Therefore, we overrule his six assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS** and **MYERS, JJ.,** concur.

Please note:

The court has recorded its own entry this date.