[Cite as *State v. Walker*, 2020-Ohio-1581.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190193 |
| | | TRIAL NO. B-1603076 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| THOMAS WALKER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: April 22, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}   Following a jury trial, defendant-appellant Thomas Walker was convicted of murder under R.C. 2903.02(A), gross abuse of a corpse under R.C. 2927.01(B), tampering with evidence under R.C. 2921.12(A)(1), and having weapons while under a disability under R.C. 2923.13(A)(3).   The trial court ordered the sentences on all four counts to be served consecutively, for a total sentence of 25 years to life in prison.  We find no merit in Walker's six assignments of error, and we affirm his convictions.

### I.  Factual Background

### A.  Walker Reports the Shooting to Police

{¶2}   The record shows that on Monday, May 30, 2016, at about 10:30 p.m., Cincinnati Police Officer Barnabus Blank was working the front desk at District One when Walker walked in and announced that "I got into it with my girl and I shot and killed her."  Walker gave him a house key and said, "You will need this to get to the body."

{¶3}   Officer Blank went into the lobby and put handcuffs on Walker.  Blank described Walker as calm, but also "sweaty and clammy," and "a little bit out of breath."  Blank saw that Walker had a gunshot wound to his left leg, so he called an ambulance.

{¶4}   Walker told Blank that the police would find the body at 705 Glenwood Avenue on the second floor.  Blank recognized the address that Walker gave him as being located in District Four.  He arranged for a squad to respond to that address, and also called District Four to give them "a heads up."

{¶5} Police Officer Alisha Bruewer was standing near the front desk when Walker walked into District One. She said that Walker was sweating profusely and appeared to be nervous. Walker stated that "it took him a little while because he had to work himself up to bring himself down to the district," and that "he and his wife got into an altercation and he had a bullet stuck in his leg." He also stated that the shooting had occurred on the Saturday before.

{¶6} Sergeant John Hein was also present at District One. He photographed the gunshot wound when the paramedics cut off Walker's pants leg. Hein said that "the coloring was definitely of interest," the wound was not bleeding, and it appeared to be "scabbed over already." The bullet was still underneath the skin, and the colors of the bruises indicated that some time had elapsed since the wound had been inflicted.

{¶7} Lieutenant William Feckter of the Cincinnati Fire Department was an EMT who came to treat Walker's gunshot wound. He said that there was already bruising around the entry point, and the entry point was "dried, with no blood or secretions." A paramedic prepared a report about the incident. The report stated, "the patient * * * said that his wife had the gun, he didn't know if she was going to shoot herself or him, so he tried to grab it * * * and it shot him in the leg."

### B. The Scene of the Crime

{¶8} Police officers went to 705 Glenwood Avenue at approximately 10:43 p.m. Upon entering the residence, they immediately smelled the decomposing body of Necole Craig, also known as Necole Jones. Rigor mortis had set in, and she was covered in dried blood and flies. Her shirt was pulled over her head. They found a gun on the couch in the living room. Written on the bedroom wall was "Necole

Jones, 1974-2016 7:12 AM * * *  Her fam did everything they could to see us unhappy. They won!!"

{¶9}    Criminalist Kim Horning processed the bedroom, where the victim's body was found.  She noticed that the sheets and rugs were soaked in blood.  There was dried vomit with what appeared to be pills in it on the floor.  A roll of duct tape was found on the bed.  In the living room, there was a cell phone under the couch, which was later determined to be Necole's.  There was also a gun on the couch and ammunition on the coffee table.  The television was on and tuned to a channel that showed true-crime shows.

{¶10}   Criminalist Jimmy Pham also processed the scene.  Pham did not find any cartridge casings, spent bullets, or bullet holes in the apartment.  Walker's fingerprints were found on a box of ammunition.   That box held 50 cartridges.  Thirty-nine cartridges were found inside of the box, ten were found in a baggie, and a spent bullet was later removed from Walker's leg.  Pham later went back to the scene with the investigating detective to search for a cartridge casing that may have been thrown into the backyard, but he did not find anything.

### C.  Scientific Evidence

{¶11}   DNA swabs were taken from the trigger and the handle grip of the gun found at the scene.  Because the samples on the two swabs were small, they were combined at the laboratory conducting the DNA analysis.  Necole's DNA was identified from the combined samples, along with a minority DNA contributor, who could not be identified.

{¶12}  The deputy coroner who examined the body found numerous old, irregular scars.  Post-mortem changes to the body indicated Necole had been deceased for "a couple of days."  There was a gunshot entrance wound on the right

side of her head and an exit wound on the left side of her head. There was no fouling or stippling or any other indication that the gun was fired from close or intermediate range.

{¶13} The coroner also found substantial bruising on the left side of Necole's head, near her temple, which was not caused by the gunshot wound. She also had bruises on her right arm and wrist. All of those bruises indicated blunt-force trauma. No pills were found in her stomach, but she tested positive for tramadol, a pain medication, as well as alcohol and cocaine.

{¶14} A firearm examiner testified that the gun found at the scene was a .32-caliber semiautomatic pistol, but it did not have a magazine. Therefore, the operator would have to manually insert the bullet in the chamber and pull the slide back. The ammunition found at the scene was also .32 caliber. The examiner test-fired the weapon using the ammunition from the scene and found it to be operable. He also determined that the bullet recovered from Walker's leg was fired from that gun.

{¶15} Officer Steven Villing of the forensic video unit, which handles all digital evidence, was given Walker's cell phone along with the cell phone found at the scene, which was later identified as Necole's. Necoles's phone contained numerous text messages from Walker which were abusive and crude. In several, he threatened to beat her or referenced times when he had beat her in the past.

### D. Testimony of the Victim's Family

{¶16} Necole's mother, daughter, and sister testified at trial. They acknowledged that Necole was a drug addict who had prostituted herself for drug money. Stella Craig, Necole's mother, testified that they were a very close family. She described her daughter as "bubbly, silly, always liking to joke, laughing with her

family, being around us." She also said that Necole was petite, and that she dressed "real cute," wore lipstick, and had her hair done.

{¶17} Stella testified that after Necole started dating Walker, she changed. She interacted less with her family and was no longer her "bubbly, silly" self. Her physical appearance changed, and she was not as "dainty and cute as she used to be." She also started wearing long sleeves and longer pants when she was around the family even when it was hot. When Necole wasn't covered, Stella noticed marks and scratches on her.

{¶18} Stella testified that Walker would often call her and that when he did, he was "angry and vulgar." He sent her texts calling her names, making threats, and degrading her daughter. He also sent her sexually-explicit photographs of her daughter. Stella turned these texts and photographs over to the police.

{¶19} Two months before Necole's death, Stella saw that Necole was missing a tooth, even though Necole had tried to hide it. Stella "flipped out" because she believed Walker had been responsible for the missing tooth. She said that Necole had tried to calm her and did not want her to be upset.

{¶20} Stella described a trip that the family, including Necole, had taken on May 27, 2016, shortly before Necole's death, to Lexington, Kentucky for a family graduation. She said that Necole seemed to be happy and having fun. A few days later, a police officer came to her door and notified her that her daughter had died. She was devastated and told the police officer, "He finally did it, * * * he killed her."

{¶21} Amanda Craig, Necole's daughter, testified that she and her mother were close, but that Necole had become distant after she starting dating Walker. She began to see bruising on Necole's back and thighs. Amanda stated that Necole would try to hide the bruises by wearing baggy clothes.

6

{¶22} In April 2019, Necole had failed to show up for Stella's wedding, so, the following day, Amanda and several other family members went to Necole's residence. They stood outside and called Necole's name for about 15 minutes. They could tell someone was in the house because they saw the curtains moving on the second floor.

{¶23} When Necole did not come out, they went to Stella's house, a few blocks away. A short time later, Necole called Amanda. Amanda said that Necole sounded "shaken" and "scared." Amanda and her brother went to get Necole and brought her to Stella's house. Amanda testified that her mother appeared tired, and "kept trying to cover her mouth" because her tooth was gone. Amanda learned that her mother had been prescribed pain medicine for the missing tooth.

{¶24} Amanda lived near Lexington. She testified that her mother came to Lexington for the family graduation. She described her mother's demeanor that day as "quiet." Necole received 15 to 20 texts and phone calls that day, which she did not answer. She acted scared when she received the texts and calls.

{¶25} Finally, Amanda testified that Necole did not like guns. She said that Necole did not know how to load or use a gun. She also stated that despite Necole's use of drugs and alcohol, she had never been violent or suicidal.

{¶26} Mequita Craig, Necole's sister, lived in Lexington. She testified that her sister was a happy "giggly" person. After she started dating Walker, she stopped showing up for family functions, and she and Mequita talked much less. Mequita stated, "After Walker, there was several bruises, teeth missing, paranoia."

{¶27} Mequita described a phone call with Necole, in which Necole was whispering. She heard background noise, and then Walker was on the phone. He cursed, called Mequita names, and said degrading things about Necole. She hung up,

but Walker continued to call her. On those calls, he would act "crazy, erratic as usual." He also texted Mequita making threats and degrading comments about Necole. At one point, Walker said that Necole would be returned to her family "in a body bag."

{¶28} Mequita was one of the family members who went to get Necole the day after the wedding. When Necole finally came to Stella's home, Mequita saw that her tooth was missing. When Necole told her what had happened, she was "crying, scared." Mequita got angry, and told her to leave the relationship.

{¶29} Necole came down to Lexington on May 27 for Mequita's daughter's graduation. In all the pictures, Necole was trying to cover her mouth due to the missing tooth. Necole's phone "would not stop ringing" that day, but she did not answer it. When the phone rang, she appeared to be scared, and she was shaking. At one point, Mequita's ten-year-old daughter answered the phone, and Mequita could hear Walker on the phone angrily asking where Necole was.

{¶30} Mequita also testified that Necole did not like guns. Mequita had tried to get her to go to the gun range, but Necole would not go. She stated that Necole did not know how to use or load a gun. Mequita acknowledged that her sister had a drug problem before she met Walker. She stated that even when Necole was using drugs, she was never violent. When they were children, Mequita always fought Necole's battles for her because Necole would not fight.

### E. Walker's Interviews with the Police

{¶31} In multiple interviews with the police, Walker insisted the shooting was accidental. He said that Necole had been drunk and possibly suicidal. He claimed the gun went off as he tried to wrestle it from her grasp. He also told police that he used the duct tape to tape his wrist to hers for a while to symbolize their

bond. He explained that he sat with her body for a few days while he worked up the courage to turn himself in to the police.

{¶32} The police interviewed Walker briefly in the hospital shortly after he had gone to District One. He admitted to owning the gun. He told the police that Necole had the gun in her right hand, but the bullet went in the left side of her head and out the right side, and into his leg. When they tested his hands for gunshot residue, he claimed that he had been playing with the gun and they would probably find gunshot residue on his hands. The test later came back negative. Because certain elements of his story did not make sense, the police planned to interview him again when he got out of the hospital.

{¶33} The police interviewed Walker at the police station the following day. He again insisted that the shooting had been an accident. He admitted to disposing of a shell casing by throwing it out the back window. The police were never able to find that casing. Walker also said he left the apartment only once, when he went out to get some orange drinks. He gave the police consent to swab his DNA. Because police did not have much information at that time, they told Walker he was free to go.

{¶34} The police subsequently talked to Necole's family. They also received information about text messages on Walker's cell phone and Necole's phone. Many of Walker's texts to Necole on his phone had been deleted, but they were still on Necole's phone. Further, though Walker claimed not to have made any calls after the shooting, Nicole's phone showed that he had called it several times in an attempt to locate the phone. After receiving information from the coroner, the firearm examiner, and others, the police believed that Walker had not been telling them the

9

truth. So they had the fugitive unit locate Walker and bring him in for another interview.

{¶35} In the third interview, the police officers used a much more accusatory tone. They testified that Walker's answers to their questions seemed "prepared" as if "he knew what he was going to say." He continued to maintain the shooting was an accident, but the details he provided were inconsistent with what he had said previously and with the scientific evidence.

### II. Prosecutorial Misconduct

{¶36} In his first assignment of error, Walker contends that prosecutorial misconduct in closing arguments denied him a fair trial. He argues that prosecutor improperly stated that she was not lying, thereby implying that defense counsel was lying, and denigrated the defendant. This assignment of error is not well taken.

{¶37} Prosecutors are normally entitled to wide latitude in their remarks. *State v. Mason*, 82 Ohio St.3d 144, 162, 694 N.E.2d 932 (1998); *State v. Wallace,* 1st Dist. Hamilton No. C-160613, 2017-Ohio-9187, ¶ 65. The test for prosecutorial misconduct is (1) whether the remarks were improper, and (2) if so, whether the remarks affected the accused's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *Wallace* at ¶ 65. The conduct of the prosecuting attorney cannot be grounds for error unless it deprives the defendant of a fair trial. *State v. Keenan*, 66 Ohio St.3d 402, 405, 613 N.E.2d 203 (1993); *Wallace* at ¶ 65.

{¶38} Walker takes issue with two comments in the prosecutor's rebuttal argument. First, the prosecutor stated, "[A]nd I am not making up things. Please use your collective memory and not—I don't—it is not my job to just come here and lie to you."

{¶39} The prosecutor's comment must be viewed in context. In his argument, defense counsel had implied that the police had done a slip-shod investigation and that the state had fabricated facts because it had insufficient evidence. In rebuttal, the prosecutor talked about how Walker's stories to the police did not match the scientific evidence. She then stated, "I submit to you, and some people don't need to change their stories. They don't have one. * * * I want to talk about Nicole now. Necole only had one story. That story is she loved the wrong person. You heard from the family * * *. They believed that Walker was verbally abusing Necole, physically harming her as well." Defense counsel objected, saying, "It's not the evidence testified to."

{¶40} The trial court overruled the objection, and then the prosecutor continued with "With Necole before Walker—and I am not making up things. Please use your collective memory and not—I don't—it is not my job to just come up here and just lie to you." After the trial court overruled Walker's objection and refused to give a curative instruction, the prosecutor discussed the family's testimony about Necole's changed behavior after she met Walker.

{¶41} The prosecutor's comment was a direct response to the defense counsel's argument, and thus, it was not improper. *See State v. Hopkins*, 2018-Ohio-1864, 112 N.E.3d 98, ¶ 97-99 (2d Dist.); *State v. Carter*, 2017-Ohio-1328, 88 N.E.3d 513, ¶ 23 (1st Dist.). The rest of her statements were fair comments on the evidence.

{¶42} Next, Walker takes issue with the following comment in the prosecutor's rebuttal argument. She stated, "That is how he felt about Necole. Not this little, ooh, boo-hoo in court where he is [c]rying. Where never did he ever show

11

any remorse in any of his three interviews." Prior to this statement, the prosecutor was talking about Walker's text messages with degrading comments about Necole.

{¶43} First, Walker did not object to this comment, so we review it for plain error. *State v. Underwood*, 3 Ohio St.3d 12, 13, 444 N.E.2d 1332 (1983); *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 38. The statement was a fair comment on the evidence. Further, it is not improper for a prosecutor to comment on the defendant's lack of remorse. *See State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 184; *State v. Awkal*, 76 Ohio St.3d 324, 335-336, 667 N.E.2d 960 (1996). We cannot hold that the comment was improper much less that it rose to the level of plain error.

{¶44} Further, even if the prosecutor's comments were improper, they were two isolated remarks in an otherwise proper argument. "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Carter*, 89 Ohio St.3d 593, 603, 734 N.E.2d 345 (2000). None of the comments that Walker complains about were so egregious as to affect his substantial rights or deny him a fair trial. Further, the trial court instructed the jury that opening and closing arguments are not evidence. We presume that the jury followed that instruction. *See State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995); *State v. Bell*, 2015-Ohio-1711, 34 N.E.3d 405, ¶ 21 (1st Dist.). Therefore, we overrule Walker's first assignment of error.

### III. Other-Acts Evidence

{¶45} In his second assignment of error, Walker contends that the trial court erred by allowing other-acts testimony into evidence. He argues that the court should not have allowed Necole's family members to testify regarding alleged acts of domestic violence in the relationship between Walker and Necole because they were

12

unrelated and irrelevant, and the only purpose of that testimony was to show his bad character.  This assignment of error is not well taken.

{¶46}  Generally, the prosecution in a criminal case may not present evidence that the defendant has committed other crimes or acts independent of the crime for which the defendant is being tried to establish that he acted in conformity with his bad character.  Evid.R. 404(B); *State v. Wright*, 2017-Ohio-1568, 90 N.E.3d 162, ¶ 43 (1st Dist.).  But Evid.R. 404(B) provides that other bad acts are admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *State v. Shedrik*, 61 Ohio St.3d 331, 337, 574 N.E.2d 1065 (1991); *Wright* at ¶ 43.

{¶47}  Because Evid.R. 404(B) codifies an exception to the general rule, it must be strictly construed against admissibility.  *State v. Coleman*, 45 Ohio St.3d 298, 299, 544 N.E.2d 622 (1989); *Wright* at ¶ 44.  Nevertheless, the other bad acts need not be similar to the crime at issue.  If the other acts tend to show by substantial proof any of the items enumerated in Evid.R. 404(B), evidence of other acts is admissible.  *Coleman* at 299-300; *Wright* at ¶ 44.

{¶48}  Walker's entire defense was that the shooting was an accident.  The state, on the other hand, had to prove that Walker purposely caused Necole's death.  The Ohio Supreme Court has indicated that evidence of prior acts of domestic violence is admissible to show motive, intent, and absence of mistake or accident.  *State v. Nields*, 93 Ohio St.3d 6, 22, 752 N.E.2d 859 (2001); *State v. Ash*, 2018-Ohio-1139, 108 N.E.3d 1115, ¶ 57 (7th Dist.); *State v. Newcomb*, 3d Dist. Logan No. 8-01-07, 2001 WL 1504260, *2 (Nov. 27, 2001); *see State v. Griffin*, 1st Dist. Hamilton No. C-020084, 2003-Ohio-3196, ¶ 14-23.

{¶49} The evidence of threats and domestic violence in this case was admissible to show motive, intent, and lack of accident. The other-acts evidence showed the violent nature of the relationship between Walker and Necole, her fear of him, and the control he exercised over her. Thus, the nature of Walker and Necole's relationship bore directly on whether he purposely killed Necole and rebutted his claim that the shooting was an accident. *See Newcomb* at *2-3. Based on that evidence, the jury could have reasonably inferred that Walker acted purposefully in killing Necole. *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 114. The fact that the other acts differ in some details from the charged offense does not affect the admissibility of the other-acts evidence. Those differences go to weight, not admissibility. *Id.* at ¶ 115.

{¶50} Walker also argues that the trial court should have excluded the other-acts evidence under Evid.R. 403(A), which provides that relevant evidence is not admissible if its "probative value is substantially outweighed by the danger of unfair prejudice." The decision whether to admit or exclude relevant evidence under Evid.R. 403(A) rests within the trial court's discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus; *State v. Johnson*, 1st Dist. Hamilton No. C-170371, 2018-Ohio-4131, ¶ 36. An appellate court will not disturb the trial court's decision to admit or exclude evidence absent an abuse of discretion and a showing that the accused has suffered material prejudice. *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985); *Johnson* at ¶ 36.

{¶51} While the admission of the other-acts evidence was undoubtedly prejudicial, the rule only required exclusion for "unfair prejudice." *See Bell*, 2015-Ohio-1711, 34 N.E.3d 405, at ¶ 48. The evidence was not presented for the sole purpose of appealing to the jurors' emotions, sympathies or biases, and the other acts

were "inextricably interwoven" with the murder charge. *See Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 45; *Bell* at ¶ 48. Consequently, the trial court did not abuse its discretion by allowing the other acts to be admitted into evidence. *See Wright* at ¶ 45; *State v. Carusone*, 1st Dist. Hamilton No. C-010681, 2003-Ohio-1018, ¶ 29. We overrule Walker's second assignment of error.

### IV. *Weight and Sufficiency*

{¶52} In his third assignment of error, Walker contends that the evidence was insufficient to support his conviction for murder. He argues that the evidence failed to show that he purposefully caused the victim's death because the death was the result of an accident. This assignment of error is not well taken.

{¶53} R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death of another * * *." A person acts purposefully when "it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶54} A person is presumed to intend the natural, reasonable and probable consequents of his or her acts. *State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978); *State v. Robinson*, 132 Ohio App.3d 830, 838, 726 N.E.2d 581 (1st Dist.1999). The determination of whether the accused acted with the required culpable mental state must be gathered from the surrounding facts and circumstances. *Johnson* at 38; *Robinson* at 838; *State v. Heard*, 1st Dist. Hamilton No. C-980443, 1999 WL 636555, *7 (Apr. 13, 1999).

{¶55} "[A]n intent to kill may be presumed where the natural and probable consequence of the wrongful act done is to produce death. It may be deduced from

15

the surrounding circumstances, including the instrument used, its tendency to destroy life if designed for that purpose, and the manner of inflicting the wound." *State v. Robinson*, 161 Ohio St. 213, 218-219, 118 N.E.2d 517 (1954).

**{¶56}** The text messages sent by Walker to the Necole and her family members showed that he had threatened to kill her in the past. When Walker turned himself in to the police, his first statement was that he had shot and killed his girlfriend. He made no mention of an accident. The story that he later told police did not match with the scientific evidence. If the shooting had happened as Walker claimed, which he said was at close range, there likely would have been fouling or stippling on Necole's head or face, but none was found. Necole's family testified that she did not like guns, she did not know how to use one, and they had never seen her hold one. Additionally, the coroner found substantial bruising on the side of Necole's face, indicating blunt-force trauma.

**{¶57}** The evidence also showed that Walker was furious when Necole did not answer his calls or texts shortly before the shooting. Additionally, the delay in reporting the shooting, his tampering with evidence at the scene, his erasure of text messages from his phone, and his attempts to locate Necole's phone all indicate a consciousness of guilt and show that he acted purposefully. Finally, in his interview with the police, the investigating detective indicated that Walker's answers about the shooting were "prepared," but when he was pressed, the details of his story were inconsistent and changed over time.

**{¶58}** Walker relies heavily on the fact that Necole's DNA was found on the gun. But this argument ignores the fact that Walker had two days to tamper with the crime scene and spent time watching true-crime shows. The scientific evidence

16

showed that DNA could transfer from surface to surface, and Walker could have easily transferred Necole's DNA onto the gun.

{¶59} The state's evidence regarding Walker's intent was circumstantial, but circumstantial and direct evidence have the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus; *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 39. Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state proved beyond a reasonable doubt all of the elements of murder. Therefore, the evidence was sufficient to support the conviction. *See Jenks* at paragraph two of the syllabus; *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29.

{¶60} Walker argues that his version of events was more credible than the state's evidence. But in deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses. *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 58. Consequently, we overrule Walker's third assignment of error.

{¶61} In his fourth assignment of error, Walker contends that his conviction for murder was against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial. Therefore, the conviction was not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E2d 582, ¶ 25 (1st Dist.).

{¶62} Walker is again arguing that his version of events is more credible. But matters as to the credibility of evidence were for the trier of fact to decide. *Bryan*,

101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 116; *Wright* at ¶ 59. We overrule Walker's fourth assignment of error.

### V. *ineffective Assistance of Counsel*

{¶63} In his fifth assignment of error, Walker contends that he was denied the effective assistance of counsel. He argues that his defense counsel failed to hire a crime scene reconstruction expert when it was crucial to showing the order of events and how the shooting occurred. This assignment of error is not well taken.

{¶64} A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, at ¶ 36. To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

{¶65} Generally, the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy. *Coleman*, 45 Ohio St.3d at 307-308, 544 N.E.2d 622; *Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, at ¶ 43. Because the decision not to present expert testimony may be tactical, the decision of trial counsel to rely on cross-examination of the state's experts did not equate to ineffective assistance of counsel. *See State v. McRae*, 1st Dist. Hamilton No. C-180669, 2020-Ohio-773, ¶ 19.

{¶66} The record shows that Walker's counsel provided him with a diligent and thorough defense. He has not demonstrated that his counsel's representation fell below an objective standard of reasonableness or that, but for his counsel's

unprofessional errors, the results of the proceeding would have been otherwise. Therefore, he has failed to meet his burden to show ineffective assistance of counsel. See *Strickland* at 687-689; *Hackney* at ¶ 37-38. We overrule Walker's fifth assignment of error.

### *VI. Sentencing*

{¶67} Finally, in his sixth assignment of error, Walker contends that the aggregate sentence imposed by the trial court was contrary to law. He argues that the court erred by imposing consecutive sentences without making the proper findings, and where a concurrent sentence would have met the statutory principles and purposes of sentencing. This assignment of error is not well taken.

{¶68} Before a reviewing court can modify or vacate a felony sentence, it must clearly and convincingly find that the sentence is contrary to law or that the record does not support the trial court's findings. Former R.C. 2953.08(G)(2); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1; *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.). When imposing consecutive sentences, a trial court must make the required findings as part of the sentencing hearing and incorporate those findings in the sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus; *State v. Cephas*, 1st Dist. Hamilton No. C-180105, 2019-Ohio-52, ¶ 43. The court need not use "talismanic words" but the record must show that the court engaged in the requisite analysis and that the evidence supports the findings. *Cephas* at ¶ 43; *State v. Schwarm*, 1st Dist. Hamilton No. C-160677, 2017-Ohio-7626, ¶ 15.

{¶69} The trial court incorporated its findings into the judgment entry. At the sentencing hearing, the prosecutor discussed the domestic violence Walker had inflicted on Necole, his prior criminal record that included previous convictions for

19

domestic violence, and his lack of remorse. The family was allowed to speak and they talked of their love for Necole and their grief and anger about her murder. As to the murder, the abuse of a corpse, and the tampering with evidence charges, the court stated:

> The defendant on or about May 28, purposely shot and killed his girlfriend Necole Craig. He shot her in the head, thus causing physical harm by means of a deadly weapon and also serious physical harm which proximately caused her death.
>
> The defendant has a long history of physically abusing his partners. Necole Craig was no exception.
>
> After killing Nicole he allowed her body to remain in the apartment with him for a 48-hour period. At one point in time he Duck-Taped [sic] his hand to hers. He allowed her body to start decaying without notifying the proper authorities, which he knew would outrage reasonable community sensibilities.
>
> The defendant also threw away the casing from the homicide with purpose to impair its availability as evidence, knowing than an official investigation was about to be or likely to be instituted.

{¶70} After announcing the sentences on the individual charges, the court stated:

> The Court finds that consecutive sentences are necessary to protect the public from future crime and to adequately punish the offender. The sentence is not disproportionate to the seriousness of the offender's conduct and the danger that the offender poses to the public. And the

offender's history of criminal conduct demonstrates it is necessary to protect the public from future crime by the offender.

{¶71}  Thus, the record shows that the court engaged in the requisite analysis and made the findings at the sentencing hearing necessary to justify the imposition of consecutive sentences.  The record supports the trial court's findings, and we cannot hold that the sentences imposed were contrary to law.  Consequently, we overrule Walker's sixth assignment of error

### *VII.  Summary.*

{¶72}  In sum, we hold that (1) Walker was not denied the right to a fair trial by prosecutorial misconduct; (2) the trial court did not err by allowing other-acts testimony into evidence; (3) the evidence was sufficient to support Walker's murder conviction; (4) his murder conviction was not against the manifest weight of the evidence; (5) he was not denied the effective assistance of counsel; and (6) he was properly sentenced.   Consequently, we overrule Walker's six assignments of error, and we affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS** and **BERGERON, JJ.,** concur.

Please note:

The court has recorded its own entry this date.